*ber Co.*, 65 Haw. 166, 173, 649 P.2d 376, 381 (1982) (internal quotation marks and citation omitted).

The record shows that Dayoan's attorneys had each practiced law in Hawai'i for almost twenty years. In addition, Section 302 had only recently been amended, and there were no published cases to serve as precedent. Moreover, Dayoan's attorneys submitted a list of Hawai'i law firms and their hourly charges for partners showing that partners in Hawai'i law firms charged between $150 and $230 on the low end, and between $250–$475 on the high end.

 Finally, although the amount in controversy cannot be determined with certainty, and although First does not contend that the *amount* of the awarded fees is unreasonable except to the extent that the total amount is calculated based on an attorneys' hourly rate of $250, First has been paying Dayoan $18,000 per year, or $162,000 over nine years. Attorneys' fees of $10,450 is not unreasonable in light of the amount in controversy or the benefits of the services provided.

The award and amount of attorneys' fees rests within the sound discretion of the Circuit Court. Nothing in the record establishes that the court has "clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice." *Chun*, 106 Hawai'i at 431, 106 P.3d at 354. Thus, we conclude that the Circuit Court did not abuse its discretion in awarding attorneys' fees of $10,450 that incorporate a rate of $250 per hour to Dayoan's attorneys.

## IV. CONCLUSION

Ultimately, First is obliged to provide the contracted for benefit because it offered the coverage, established the price at which it was offered, accepted Dayoan's premiums as-

sociated with the coverage, and assured him that he would receive the benefit until he died.

The Circuit Court did not err in granting summary judgment or in awarding attorneys' fees and costs to Dayoan. Accordingly, we affirm the November 1, 2006 Final Judgment that was entered in the Circuit Court of the Third Circuit.

246 P.3d 369

Richard **NELSON** III; Kaliko Chun; James Akiona, Sr.; Sherilyn Adams; Kelii Ioane, Jr.; and Charles Aipia, Plaintiffs–Appellants,

v.

**HAWAIIAN HOMES COMMISSION**; The Department of Hawaiian Home Lands; Kaulana H.R. Park,[1] in his official capacity as Chair of the Hawaiian Homes Commission; Perry Artates, Alapaki Nahale-a, Donald S.M. Chang, Stuart Hanchett, Malia Kamaka, Francis Lum, Trish Morikawa, and Henry K. Tancayo,[2] in their official capacities as members of the Hawaiian Homes Commission; Kalbert K. Young,[3] in his official capacity as the State Director of Finance; and The State of Hawaii, Defendants–Appellees.

No. 30110.

Intermediate Court of Appeals of Hawai'i.

Jan. 12, 2011.

---

1. When the complaint was filed in this lawsuit, Micah A. Kane was the Chair of the Hawaiian Homes Commission. He was succeeded in 2009 by Kaulana H.R. Park. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Kaulana H.R. Park has been substituted as a party in place of Micah A. Kane.

2. When the complaint was filed, Billie Baclig and Milton Pa were two of the commissioners.

They were succeeded by Alapaki Nahale-a and Henry K. Tancayo. Pursuant to HRAP Rule 43(c)(1), Alapaki Nahale-a and Henry K. Tancayo have been substituted as parties in place of Billie Baclig and Milton Pa.

3. When the complaint was filed, Georgina K. Kawamura was the State Director of Finance. She was succeeded by Kalbert K. Young. Pursuant to HRAP Rule 43(c)(1), Kalbert K. Young has

David Kimo Frankel (Alan T. Murakami with him on the briefs) (Native Hawaiian Legal Corporation), for Plaintiffs–Appellants.

Girard D. Lau, First Deputy Solicitor General (Charleen M. Aina, Deputy Attorney General, with him on the brief), for Defendants–Appellees State of Hawai'i and Kalbert K. Young, in his official capacity as the State Director of Finance.

Brian A. Kang (Emi L.M. Kaimuloa with him on the brief) (Watanabe Ing LLP), for Defendants–Appellees Hawaiian Homes Commission, The Department of Hawaiian

been substituted in place of Georgina K. Kawamura.

Home Lands; Kaulana H.R. Park, in his official capacity as Chair of the Hawaiian Homes Commission; Perry Artates, Alapaki Nahale-a, Donald S.M. Chang, Stuart Hanchett, Malia Kamaka, Francis Lum, Trish Morikawa, and Henry K. Tancayo, in their official capacities as members of the Hawaiian Homes Commission.

FOLEY and FUJISE, JJ.; NAKAMURA, C.J., concurring separately.

Opinion of the Court by FOLEY, J.

Plaintiffs–Appellants Richard Nelson III; Kaliko Chun; James Akiona, Sr.; Sherilyn Adams; Kelii Ioane, Jr.; and Charles Aipia[4] (Plaintiffs) appeal from the Final Judgment filed on September 23, 2009 in the Circuit Court of the First Circuit[5] (circuit court).

## I.

Plaintiffs sought declaratory and injunctive relief in the circuit court, claiming that (1) Defendants–Appellees Hawaiian Homes Commission; The Department of Hawaiian Home Lands (DHHL); Micah A. Kane, in his official capacity as Chair of the Hawaiian Homes Commission (Chair); Perry Artates, Billie Baclig, Donald S.M. Chang, Stuart Hanchett, Malia Kamaka, Francis Lum, Trish Morikawa, and Milton Pa, in their official capacities as members of the Hawaiian Homes Commission (the Chair and the members are collectively referred to as commissioners); Georgina K. Kawamura, in her official capacity as the State Director of Finance; and the State of Hawaii (the State) (collectively, Defendants) were obligated by Article XII (Hawaiian Homes Commission Act, 1920 (HHCA)), Sections 1 and 2 of the Constitution of the State of Hawaii (Hawai'i Constitution) to provide particular levels of funding to the DHHL and (2) the State failed in the past to provide sufficient funds to DHHL.

In their October 19, 2007 First Amended Complaint for Declaratory and Injunctive Relief, Plaintiffs alleged, in relevant part:

*FACTUAL ALLEGATIONS*

23. As of May 1983, there were 7,901 eligible beneficiaries on the waiting lists for Hawaiian homesteads.

24. There are currently over 20,000 people on the Hawaiian Home Lands waitlist.

25. Hundreds of native Hawaiians have been on the [DHHL's] waiting list for over three decades.

26. Until 1987, the State failed to appropriate a single dollar of general fund revenues, generated from its various general and special tax revenue sources, to pay for the operations and programs of the [DHHL] and its homesteading programs.

27. In 1987, the State [L]egislature [(the Legislature)], for the first time, appropriated general funds from state revenues to the operating budget of the [DHHL].

28. General revenue appropriations for the [DHHL] peaked at over $4.2 million per year in fiscal year 1992.

29. In 1994, the Legislature enacted Act 14 to compensate the [DHHL] for breaches of the [HCCA] trust committed by the [S]tate between 1959 and 1988 that deprived the trust of assets and income improperly.

30. Act 14 (SLH 1994, Special Sess.) authorized the payment of $30 million per year for 20 years to compensate the trust for these trust breaches, provided that this sum not count toward the current fiscal obligations of the State to the [HCCA] trust.

31. During her 2002 election campaign Governor Linda Lingle pledged to eliminate the [DHHL] waiting list in 5 years.

32. In 2007 the [Legislature] appropriated less than $1.5 million in general revenue appropriations to the [DHHL].

33. Since 1987, the Legislature appropriated annual general revenue funds for the administration and operating budgets of the [DHHL] without regard to whether

---

4. Charles Aipia passed away on January 11, 2008.

5. The Honorable Bert I. Ayabe presided over the proceedings, and the Honorable Derrick H.M. Chan signed the Final Judgment.

the funding reflected the amounts actually needed by the department to fully implement and administer all programs to assure that the spirit of the [HHCA] was effectively carried out.

34. Between 1989 through 2007, the [S]tate's general fund appropriation to the [DHHL] for its administration and operating budget never exceeded 0.5% of the total general fund budget for any given fiscal year.

35. Simultaneously, since 1979, the Legislature appropriated major general fund revenues for other purposes which were not mandated by the Hawai'i Constitution and for items of no constitutional priority.

36. Over the past decade, state funding for the Hawaii Tourism Authority, which is not constitutionally mandated, has increased from zero to over eighty seven million dollars a year, increasing by $22 million in the past fiscal year alone.

37. Over the past four fiscal years, the [DHHL] has awarded an average of fewer than six hundred leases to native Hawaiians annually.

38. The length of the Hawaiian Homes waiting list has remained virtually unchanged since 2002.

. . . .

### COUNT 1

(Violation of the Constitutional Duty to Sufficiently Fund the [DHHL])

. . . .

61. In 1979, the voters of Hawai'i ratified an amendment passed by the 1978 Hawai'i Constitutional Convention delegates which specifically required the Legislature to provide the [DHHL] "sufficient sums" to pay for its trust programs and operating budget.

62. Under [Hawai'i Constitution] Article XII, [Section] 1, the [L]egislature must make sufficient sums available for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic,

political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the [DHHL]; in furtherance of (1), (2), (3) and (4) herein, by appropriating the same in the manner provided by law.

63. Furthermore, under the [HHCA] [Section] 219.1, the Defendants are obligated to assist the lessees in obtaining maximum use of their leased lands, including taking any steps necessary to develop these lands for their highest and best use commensurate with the purposes for which the land is being leased, and assisting the lessees in all phases of farming, ranching, and aquaculture operations and the marketing of their agricultural or aquacultural produce and livestock.

64. Hawaiian homestead beneficiaries cannot achieve the lofty aims of the [HHCA] unless they are awarded homesteads timely and provided sufficient assistance to maximize their utilization of those lands for the purposes set out in the [HHCA].

65. Payments made pursuant to Act 14, 1995 Special Session, do not diminish funds that the [DHHL] is entitled to pursuant to Article XII, [S]ection 1 of the [Hawai'i Constitution].

66. Accordingly, the compensation for past breaches of trust by the State under Act 14 is exclusive of the "sufficient sums" to which the DHHL is entitled pursuant to Article XII, [S]ection 1 of the [Hawai'i Constitution].

67. The infrastructure cost to develop Hawaiian Home Land lots on average is approximately $100,000 per lot.

68. According to [the] Hawaiian Homes Commission Chair . . ., "The model is there, the projects are there, the momentum is there. Now, it's just an issue of money."

69. According to [the] Hawaiian Homes Commission Chair . . ., a conservative estimate of the funding necessary for infrastructure to place one thousand homesteaders each on homestead lands each year is $100,000,000 annually.

70. In contrast, other than the funding provided pursuant to Act 14, the [DHHL] received less than one and a half million dollars in general revenue funds from the [L]egislature for fiscal year 2007.

71. Simultaneously, since 1994, the [State] has not floated nor issued any capital improvement bond financing to support the need for additional DHHL infrastructure.

72. The [DHHL] does not currently receive sufficient funding to develop house lots for all applicants on the waiting list.

73. The [DHHL] does not currently receive sufficient funding to reduce the waiting list by ninety percent over the next decade.

74. The [DHHL] does not currently receive sufficient funding to pay for the development of homesteads for applicants on the waiting list within a reasonable time frame.

75. The [DHHL] does not currently receive sufficient funds for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the [DHHL]; in furtherance of (1), (2), (3) and (4) herein.

76. The [S]tate administration fails to annually request "sufficient sums" for the administration and operating budget of the [DHHL] to assure that all the programs of the department prescribed under Article XII, [Section] 1 are adequately funded.

77. Accordingly, Plaintiffs are entitled to a declaration by this court that Defendants are in breach of their duties under Article XII, [Sections] 1 and 2.

78. Plaintiffs are also entitled to mandatory injunction requiring the State to provide sufficient funds to the [DHHL] to (a) place as many beneficiaries on the department's waiting lists for residences, farms, and ranches on available Hawaiian home lands within a reasonable period of time; (b) fund a fully functioning farm, ranch, and aquaculture support program to enable homesteaders to maximize utilization of their homestead lands.

### COUNT 2

(Breach of Trust Obligation to Seek Sufficient Funds from the Legislature)

. . . .

80. A trustee is obligated to institute action and proceedings for the protection of the trust estate and the enforcement of claims and rights belonging thereto, and to take all legal steps which may be reasonably necessary with relation to those objectives.

81. Under trust principles applicable to all trustees, Defendants owe their beneficiaries a duty of exclusive loyalty to take action to promote their specific interests under the terms of the trust.

82. The Hawaiian Homes Commission and the commissioners have a trust duty to seek from the [L]egislature all the funds it deems necessary to fulfill the spirit and intent of the [HHCA].

83. The Hawaiian Homes Commission and its commissioners have not requested from the [L]egislature sufficient funds to fulfill the spirit and intent of the [HHCA].

84. For years, these defendants have not affirmatively sought to enforce the literal terms of Act 14 [SLH 1995, Spec. Sess.] by demanding "sufficient sums" exclusive of payments under that act in order to fulfill their duties of loyalty to their beneficiaries.

85. The Hawaiian Homes Commission and its commissioners have not, as of yet, sued the [State] to obtain sufficient funds to fulfill the spirit and intent of the [HHCA].

86. Accordingly, Plaintiffs are entitled to a declaration by this court that Defendants the Hawaiian Homes Commission and its commissioners . . . are in breach of their duties under Article XII, [Sections] 1 and 2 by not suing for enforcement of these constitutional mandates.

87. Plaintiffs are also entitled to mandatory injunction requiring Defendants the Hawaiian Homes Commission and its commissioners ... to request and actively pursue that level of funding for the [DHHL] from the Legislature to meet the costs of placing as many beneficiaries on the department waiting lists for residences, farms, and ranches on available Hawaiian home lands within a reasonable period of time, and funding farm, ranch, and aquaculture support programs.

(Brackets in original omitted.)

On appeal, Plaintiffs contend the circuit court erred in granting summary judgment and concluding that the political question doctrine bars justiciability of Plaintiffs' claims. The circuit court concluded:

There are no judicially discoverable and manageable standards for resolving the dispute over the definition and determination of "sufficient sums" under Article XII, Sections 1 & 2, of the [Hawai'i Constitution] without making initial policy determinations of a kind clearly for nonjudicial discretion.

## II.

The Hawai'i Supreme Court has stated that an appellate court

reviews the circuit court's grant of summary judgment de novo. *Price v. AIG Hawai'i Ins. Co.*, 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." HRCP Rule 56(c).

*Gillan v. Gov't Employees Ins. Co.*, 119 Hawai'i 109, 114, 194 P.3d 1071, 1076 (2008).

## III.

█ The issue on appeal is: Is whether the Legislature has provided sufficient sums to DHHL pursuant to Article XII, Section 1 of the Hawai'i Constitution a "political question"?

In deciding whether the political question doctrine should be invoked, the Hawai'i Supreme Court in *Trustees of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 737 P.2d 446 (1987), adopted the test recited by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.

*Yamasaki*, 69 Haw. at 170, 737 P.2d at 455 (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. at 710).

## IV.

In deciding whether the funding of DHHL is a political question, we must look to the proceedings of the Constitutional Convention of Hawaii of 1978 (1978 Constitutional Convention). The Hawai'i Supreme Court has long recognized that

" 'the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional principle is to give effect to that intent.' " *Save Sunset Beach Coal. v. City & County of Honolulu*, 102 Hawai'i 465, 474, 78 P.3d 1, 10 (2003) (quoting *Convention Center Auth. v. Anzai*, 78 Hawai'i 157, 167, 890 P.2d 1197, 1207 (1995)

(internal quotation marks and citations omitted)).

" 'The general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written.' " *Kelly v. 1250 Oceanside Partners*, 111 Hawaiʻi 205, 223–224, 140 P.3d 985, 1003–04 (2006) (quoting *Taomae v. Lingle*, 108 Hawaiʻi 245, 251, 118 P.3d 1188, 1191 (2005) (citations omitted)). Furthermore, in interpreting a constitutional provision, "this court 'may look to the object sought to be established and the matters sought to be remedied along with the history of the times and state of being when the constitutional provision was adopted.' " *Id.* at 225, 140 P.3d at 1005 (quoting *City & County of Honolulu v. Ariyoshi*, 67 Haw. 412, 419, 689 P.2d 757, 763 (1984) (citation omitted)). *Kahoʻohanohano v. State*, 114 Hawaiʻi 302, 339, 162 P.3d 696, 733 (2007).

## V.

The language of Section 1 of Article XII came from the Committee on Hawaiian Affairs of the 1978 Constitutional Convention. Stand. Comm. Rep. No. 56 in I *Proceedings of the Constitutional Convention of Hawaii of 1978*, at 628–34 (1980). The Committee on Hawaiian Affairs proposed to amend Section 1 as follows (bracketed material to be repealed; underscored material to be added):

Anything in this constitution to the contrary notwithstanding, the Hawaiian Homes Commission Act, 1920, enacted by the Congress, as the same has been or may be amended prior to the admission of the State, is hereby adopted as a law of the State, subject to amendment or repeal by the legislature, provided, that if and to the extent that the United States shall so require, said law shall be subject to amendment or repeal only with the consent of the United States and in no other manner, provided, further that, if the United States shall have been provided or shall provide that particular provisions or types of provisions may be so amended. The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms and spirit of said Act[,]. [and the]

(A) The legislature [may, from time to time, make additional] shall make sufficient sums available for the purposes of: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social, and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian Home Lands; in furtherance of (1), (2), (3) and (4) herein, [said Act] by appropriating the same in the manner provided by law.

Comm. Rep. No. 56, at 629.

In proposing this amendment, the Committee on Hawaiian Affairs stated the clear intent of the amendment:

Your committee proposal makes it expressly clear that the legislature is to fund DHHL for purposes which reflect the spirit and intent of the [HCCA]. Your Committee decided to no longer allow the legislature discretion in this area.

Your Committee decided that the [L]egislature should provide sufficient funds to DHHL for the following projects:

1. For the development of site improvements for homes, agriculture, farm and ranch lots. Development shall include but not be limited to off-site and on-site improvements which are necessary to provide grading, access (roads) and utility services (drainage, sewerage, water and electrical systems) for the developed lots;

2. For lessee loans in the areas of home construction and farm and ranch construction and equipment. Under this loan mandate, DHHL is authorized to request loans for lessees or native Hawaiians for agricultural purposes, which includes but is not limited to acquaculture;

3. For various rehabilitation projects, including education, social, political, economic and cultural processes which contribute to the general welfare and betterment of native Hawaiian conditions; and

4. For administrative and operational costs, which expenditure requests are to be utilized for all of the above-mentioned.

Comm. Rep. No. 56, at 630.

The Committee on Hawaiian Affairs added:

The department was established by the [HCCA] to provide a means to rehabilitate its beneficiaries through a series of projects and yet was given very little financial assistance to perfect its mandate. For example, the department must lease its lands in order to generate revenues to support its administrative and operating budget.

. . . .

The department presently general leases its lands to obtain moneys for administrative expenses and salaries. In order to keep up with a built-in inflation rate and to rehire prospective employees through SCET losses, DHHL continues to general lease more of its lands. These employees are necessary to keep up with the current housing output. DHHL averages 10 dollars per acre on its general leases.

DHHL cannot afford to lease more acreage to the general public for the purpose of generating income to accommodate a minimal employee level.

It is clear to your Committee that the intent and spirit of the Act would be better moneys served by releasing the department of its present burden to generate revenues through the general leasing of its lands. Your Committee decided that through legislature funding this dilemma would be resolved. In that manner more lands could be made available to the intended beneficiaries.

Comm. Rep. No. 56, at 631–32.

When this proposed amendment came before the Committee of the Whole of the 1978 Constitutional Convention, the Committee on Hawaiian Affairs members addressed what constituted "sufficient funds."

Delegate Sutton stated:

Again, to the word "sufficient"—what does this really mean? It means funding to develop house lots for applicants on the waiting list or implied in the general plan.

It also means money to provide loans to lessees to construct their homes, since the lessee cannot mortgage or encumber the land.

For the administration, there is need for support of a staff to adequately service the department's beneficiaries and to purchase equipment which will allow sufficient management of its resources and records.

II *Proceedings of the Constitutional Convention of Hawaii of 1978,* at 414.

Delegate Crozier added:

Mr. Chairman, I'd like to speak in favor of this proposal. The proposal states: "The legislature shall make sufficient sums available. . . ." The standards which define "sufficient" are contained in the department's general plan, approved by the Hawaiian homes commission on October 31, 1975 and signed by Governor Ariyoshi on April 14, 1976.

*Id.* at 415.

Committee on Hawaiian Affairs Chairperson De Soto (De Soto) followed:

What we propose with respect to "shall fund" is the administrative and costs of running the Hawaiian homes program, which would amount to operating and administrating approximately $1.3 million to $1.6 million, taking into consideration inflation, collective bargaining agreements that go into inflation with the pay.

*Id.* at 421.

## VI.

In deciding whether the 1978 constitutional amendment requiring sufficient funding of DHHL is a political question, we apply the test set forth in *Yamasaki* to the intent of the delegates to the 1978 Constitutional Convention. The presence of any of the following six factors would make this case nonjusticiable:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

69 Haw. at 170, 737 P.2d at 455.

## A. TEXT

As it stands, the language of Article XII, Section 1, as amended, does not constitute a textually demonstrable constitutional commitment of the issue to a coordinate political department.

■ The language of Article XII, Section 1 prior to the 1978 amendment was a textually demonstrable constitutional commitment of the issue to the legislature. However, the 1978 amendment changed the language "may, from time to time make additional" sums available to "shall make sufficient" sums available. In proposing this change, the Committee on Hawaiian Affairs stated that its intention was to deprive the Legislature of the discretion to provide sufficient sums to DHHL. If the question of what are sufficient sums were nonjusticiable, the 1978 constitutional amendment would be devoid of any real substance and effect. It would result in giving the Legislature unreviewable discretion to determine what are sufficient sums—contrary to the stated intent of the framers of the amendment. We cannot "ascribe to the constitutional framers the intent to enact laws devoid of any real substance and effect." *In re Water Use Permit Applications*, 94 Hawai'i 97, 142, 9 P.3d 409, 454 (2000).

A constitutional provision must be construed to avoid an absurd result and to recognize the mischief the framers intended to remedy. As a matter of policy, we do not blindly apply rules of construction to the point that we reach absurd conclusions that are inconsistent with the intent of our lawmakers.

*United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Yogi*, 101 Hawai'i 46, 53, 62 P.3d

189, 196 (2002) (internal quotation marks and citations omitted).

## B. STANDARDS

There is no lack of judicially discoverable and manageable standards for resolving the question of what are sufficient funds. The 1978 Constitutional Convention set forth the standards:

1. For the development of site improvements for homes, agriculture, farm and ranch lots. Development shall include but not be limited to off-site and on-site improvements which are necessary to provide grading, access (roads) and utility services (drainage, sewerage, water and electrical systems) for the developed lots;

2. For lessee loans in the areas of home construction and farm and ranch construction and equipment. Under this loan mandate, DHHL is authorized to request loans for lessees or native Hawaiians for agricultural purposes, which includes but is not limited to acquaculture;

3. For various rehabilitation projects, including education, social, political, economic and cultural processes which contribute to the general welfare and betterment of native Hawaiian conditions; and

4. For administrative and operational costs, which expenditure requests are to be utilized for all of the above-mentioned.

Comm. Rep. No. 56, at 630.

It is very clear that the amendment was to end DHHL's practice of leasing its "lands in order to generate revenues to support its administrative and operating budget." *Id.* at 631. By legislative funding of the administrative and operating budget of DHHL "more lands could be made available to the intended beneficiaries" of the HHCA. *Id.* at 632.

Delegate Sutton stated that sufficient sums means funding to develop house lots for applicants on the waiting list or implied in the general plan. It also means money to provide loans to lessees to construct their homes, since the lessee cannot mortgage or encumber the land.

For the administration, there is need for support of a staff to adequately service the

department's beneficiaries and to purchase equipment which will allow sufficient management of its resources and records.

II *Proceedings of the Constitutional Convention of Hawaii of 1978*, at 414.

De Soto stated that sufficient sums in 1978 meant the "administrative and costs of running the Hawaiian homes program, which would amount to operating and administrating approximately $1.3 million to $1.6 million, taking into consideration inflation, collective bargaining agreements that go into inflation with the pay." *Id.* at 421.

Delegate Crozier stated that the "standards which define 'sufficient' are contained in the department's general plan, approved by the Hawaiian [H]omes [C]ommission on October 31, 1975 and signed by Governor Ariyoshi on April 14, 1976." *Id.* at 415.

## C. POLICY

The initial policy determination on what are sufficient sums was made by the 1978 Constitutional Convention and is therefore not for a court to decide. The convention cited with approval the DHHL April 1976 General Plan that set forth the policy of DHHL in making Hawaiian home lands available to persons of at least one-half Hawaiian blood. The General Plan set forth ten-year goals and objectives that were summarized as follows:

1. *Goal* : Maximize HOUSING assistance for native Hawaiians.

 *Objective* : Program housing for 2,600 new families.

2. *Goal* : Allocate AGRICULTURAL LANDS to native Hawaiians.

 *Objective* : Allocate at least 40,000 additional acres for direct agricultural use by eligible Hawaiians; use all available techniques to maximize productivity of agricultural lands. (Note: The [HHCA] sets 20,000 acres as the limit which can be allocated within any five-year period.)

3. *Goal* : Reduce the acreage of LANDS USED FOR INCOME purposes.

 *Objective* : Reduce by at least 20,000 acres the lands presently under general lease and temporary use permit and make these lands available for direct use by native Hawaiians.

4. *Goal* : Maximize INCOME through more effective land management.

 *Objective* : Use only a small fraction of Hawaiian Home Lands to generate sufficient income for operating and administrative expenses.

■ The General Plan stated that the goals and objectives of the DHHL should be re-evaluated at five-year intervals. The DHHL has a fiduciary duty to continue to re-evaluate its goals and objectives in light of the 1978 constitutional amendment and request that the legislature provide sufficient sums to meet these goals and objectives. *Ahuna v. Dep't of Hawaiian Home Lands*, 64 Haw. 327, 337–40, 640 P.2d 1161, 1168–69 (1982). In making its request for funds, DHHL shall be guided by the policy and standards set forth in the 1978 Constitutional Convention and DHHL's April 1976 General Plan and any revision thereof. Whether DHHL's request for funds from the legislature is reasonable is reviewable by the courts. *Ahuna*, 64 Haw. at 337–40, 640 P.2d at 1168–69.

## D. RESPECT

■ There is no lack of respect to the legislature in a court's addressing the question of sufficient sums. The 1978 Constitutional Convention emphatically stated that the legislature has no discretion in this area. The "courts, not the legislature, are the ultimate interpreters of the Constitution." *State v. Nakata*, 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994) (internal quotation marks and citation omitted).

## E. ADHERENCE TO POLITICAL DECISION

This case and question do not present an unusual need for unquestioning adherence to a political decision already made. The need is for adherence to the Hawai'i Constitution and the intent of the framers of the 1978 amendment to Article XII, Section 1. There is no unusual need for unquestioning adherence to a legislative decision not to make sufficient sums available to DHHL as mandated by the Hawai'i Constitution.

## F. EMBARRASSMENT

There is no potential for embarrassment due to multifarious pronouncements by various departments on one question. In this case, DHHL should ask the legislature to make sufficient sums available to it. DHHL shall be guided by the 1978 Constitutional Convention in determining the amount of sums it should request from the legislature. The legislature will or will not make sufficient sums available. If there is a dispute as to whether the sums are sufficient, the courts may be asked to resolve the question. In resolving this question, the courts would consider the request of DHHL, the response of the legislature, and the mandate of the 1978 Constitutional Convention.

Because none of the six factors set forth in *Yamasaki* is present in this case, the question of the legislature making sufficient sums available to the DHHL is justiciable and therefore not a political question.

## VII.

Therefore, the Final Judgment filed on September 23, 2009 in the Circuit Court of the First Circuit is vacated, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

Concurring Opinion by NAKAMURA, C.J.

I agree with the majority's conclusion that the political question doctrine does not preclude the justiciability of the dispute over whether the Legislature, pursuant Article XII, Section 1 of the Hawai'i Constitution, has made "sufficient sums" available for the purposes identified in that constitutional provision. I therefore concur in the result reached by the majority to vacate the Final Judgment of the Circuit Court of the First Circuit (circuit court) and to remand the case for further proceedings. I write separately to explain my analysis.

1. The predecessor to the current Article XII, Section 1 of the Hawai'i Constitution was set forth in Article XI, Section 1. As a result of amendments proposed by the 1978 Constitutional Convention and adopted by voters, the previous Article XI, entitled "Article XI Hawaiian Home Lands," was

## I.

Prior to its amendment in 1978, Article XII, Section 1 of the Hawai'i Constitution[1] provided, in relevant part: "The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms of [the Hawaiian Homes Commission] Act, *and the legislature may, from time to time, make additional sums available for the purposes of said Act* by appropriating the same in the manner provided by law." (Emphasis added.) Thus, prior to the 1978 amendment, it was clear that the Legislature had discretion regarding whether to make additional sums available for the purposes of the Hawaiian Homes Commission Act (HHCA).

Pursuant to amendments proposed by the 1978 Constitutional Convention and approved by voters, Article XII, Section 1 was amended in relevant part to read as follows:

The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms and spirit of [the Hawaiian Home Commission] Act. *The legislature shall make sufficient sums available for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3) and (4) herein,* by appropriating the same in the manner provided by law.

(Emphasis added.) The 1978 amendment changed the language of the constitutional provision from "the legislature may, from time to time, make additional sums available" to "[t]he legislature shall make sufficient sums available" for the identified purposes.

renumbered and redesignated as "Article XII Hawaiian Affairs." For simplicity, I will use "Article XII, Section 1" when referring to the current Article XII, Section 1 as well as its pre–1978 predecessor, Article XI, Section 1.

## II.

Plaintiffs–Appellants Richard Nelson III; Kaliko Chun; James Akiona, Sr.; Sherilyn Adams; Kelii Ioane Jr.; and Charles Apia (collectively, "Plaintiffs") filed an amended complaint against Defendants–Appellees Hawaiian Homes Commission (HHC); the Department of Hawaiian Home Lands (DHHL); the Chair and the members of the HHC in their official capacities; the State Director of Finance in her official capacity; and the State of Hawai'i (State) (collectively, "Defendants").[2] Plaintiffs sought declaratory and injunctive relief against Defendants for "violation of the constitutional duty [under Article XII, Section 1 of the Hawai'i Constitution] to sufficiently fund the [DHHL]" (Count 1) and for "breach of trust obligation to seek sufficient funds from the legislature" (Count 2).[3] The circuit court granted summary judgment in favor of Defendants on Counts 1 and 2 and dismissed those counts, concluding that:

> Although Plaintiffs raised allegations that were of concern to this Court, the Court finds that the political question doctrine bars justiciability of Plaintiffs' claims. There are no judicially-discoverable and manageable standards for resolving the dispute over the definition and determination of "sufficient sums" under Article XII, Sections 1 and 2 [4] of the Constitution of the State of Hawaii without making initial policy determinations of a kind clearly for nonjudicial discretion.

## III.

This appeal turns on whether the question underlying Plaintiffs' claims, namely, whether the Legislature has made "sufficient sums" available under Article XII, Section 1, involves a nonjusticiable political question.

In *Trustees of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 737 P.2d 446 (1987), the Hawai'i Supreme Court cited and applied the test articulated by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), for determining whether a case involves a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding, without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.

*Yamasaki*, 69 Haw. at 170, 737 P.2d at 455 (quoting *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. 691).

2. Defendants–Appellees the HHC, the DHHL, and the Chair and the members of the HHC in their official capacities will collectively be referred to as the "DHHL Defendants," and Defendant–Appellees State and the State Director of Finance in her official capacity will collectively be referred to as the "State Defendants."

3. The remaining counts of the amended complaint, Counts 3 and 4, were dismissed pursuant to a stipulation of the parties and are not in issue in this appeal.

4. Article XII, Section 2 of the Hawai'i Constitution provides:

> The State and its people do hereby accept, as a compact with the United States, or as conditions or trust provisions imposed by the United States, relating to the management and disposition of the Hawaiian home lands, the requirement that section 1 hereof be included in this constitution, in whole or in part, it being intended that the [Hawaiian Homes Commission] Act or acts of the Congress pertaining thereto shall be definitive of the extent and nature of such compact, conditions or trust provisions, as the case may be. The State and its people do further agree and declare that the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out.

## IV.

Defendants[5] rely upon two elements of the *Baker v. Carr* formulation in support of their argument that the dispute over whether the Legislature has made "sufficient sums" available involves a political question: (1) the "lack of judicially discoverable and manageable standards for resolving [the dispute]"; and (2) "the impossibility of deciding [Plaintiffs' claims] without an initial policy determination of a kind clearly for nonjudicial discretion." *See Yamasaki,* 69 Haw. at 170, 173, 737 P.2d at 455, 457. In their brief, the State Defendants assert that "there are *no judicially discoverable or manageable standards* for evaluating whether a particular level of legislative funding to DHHL satisfies any obligation imposed by Article XII, Section 1, and any attempt to resolve that question would require resort to *non-judicial policy* determinations."

Central to Defendants' argument is their assertion that Plaintiffs' claims involve a nonjusticiable political question if a court cannot determine with particularity how much money the Legislature is required to make available to the DHHL under Article XII, Section 1. Defendants' basic reasoning is as follows:

1. A court cannot decide whether the Legislature has satisfied the "sufficient sums" requirement of Article XII, Section 1 unless the court can determine with particularity how much money ("the 'correct' dollar figure") the Legislature is required to appropriate to the DHHL.

2. The only way to determine with particularity how much money the Legislature is required to appropriate is to know how many home, agriculture, farm, and ranch lots the DHHL must develop within a certain period of time.[6]

3. How many lots the DHHL must develop within a certain period of time is "totally unknowable" from the language of Article XII, Section 1. Any attempt by a court to determine this number would require it to make policy decisions reserved for nonjudicial discretion.

4. Thus, the question of whether the Legislature has made sufficient sums available for development of home, agriculture, farm, and ranch lots presents a "classic political question." [7]

Plaintiffs dispute Defendants' premise that for Plaintiffs' claims to be justiciable and to avoid the political question bar, the court must be able to calculate a specific sum of money that the Legislature is required to provide. Plaintiffs state that they "seek no specific damages" and that it is not necessary for this court "to determine precisely how much money would be sufficient for DHHL" under Article XII, Section 1 to rule in Plaintiffs' favor. Plaintiffs emphasize that they "are *not* asking the Court to determine what funds would be sufficient; only that what is currently provided is plainly insufficient." Plaintiffs assert that "by any reasonable definition of 'sufficient funds,' the State has *not* been providing 'sufficient funds' to DHHL and is breaching this constitutional provision."

## V.

In construing the language of Article XII, Section 1, the following standards set forth by the Hawai'i Supreme Court apply:

[The Hawai'i Supreme Court has] long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpret-

---

**5.** The State Defendants and the DHHL Defendants make the same basic arguments with respect to the political question doctrine in their briefs on appeal. In the circuit court, the DHHL Defendants joined in the State Defendants' motion for summary judgment which argued that Plaintiffs' claims were barred by the political question doctrine. In this concurring opinion, arguments attributed to either the State Defendants or the DHHL Defendants apply to both of them.

**6.** The State Defendants describe the Legislature's making sufficient sums available for development of home, agriculture, farm, and ranch lots as "the principal directive of Article XII, Section 1."

**7.** Defendants argue that a similar analysis applies to the question of whether the Legislature has made sufficient sums available for the other purposes identified in Article XII, Section 1.

ing a constitutional [provision] is to give effect to that intent.

The general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written. Furthermore, in interpreting a constitutional provision, this court may look to the object sought to be established and the matters sought to be remedied along with the history of the times and state of being when the constitutional provision was adopted.

*Kahoʻohanohano v. State,* 114 Hawaiʻi 302, 339, 162 P.3d 696, 733 (2007) (internal quotation marks, citations, and ellipsis points omitted). The supreme court does not "ascribe to the constitutional framers the intent to enact laws devoid of any real substance and effect[.]" *In re Water Use Permit Applications,* 94 Hawaiʻi 97, 142, 9 P.3d 409, 454 (2000).

## VI.

I do not agree with Defendants' principal argument that this court must hold that Plaintiffs' claims involve a nonjusticiable political question unless we can say with particularity how much money the Legislature is required to appropriate to the DHHL under Article XII, Section 1.

Prior to its amendment by the 1978 Constitutional Convention, Article XII, Section 1 left the matter of legislative funding to the Legislature's discretion by providing that "the legislature may, from time to time, make additional sums available for the purposes of [the HHCA]. . . ." The 1978 amendment changed the language of the constitutional provision to read that "[t]he legislature shall make sufficient sums available" for the purposes identified in Article XII, Section 1.

Is it clear that the "shall make sufficient sums available" language in Article XII, Section 1 was prompted by the dissatisfaction of the constitutional framers (the 1978 Constitutional Convention delegates) with the prior extent of the progress being made in providing lands to native Hawaiian beneficiaries under the HHCA and the Legislature's funding support for the DHHL. The amendment to Article XII, Section 1 at issue in this appeal was proposed by the Committee on

Hawaiian Affairs of the 1978 Constitutional Convention. The Committee on Hawaiian Affairs explained the background and intent of the proposed "sufficient sums" amendment, which was subsequently approved by voters, in Standing Committee Report No. 56 (the "Hawaiian Affairs Committee Report"):

> *Your committee proposal makes it expressly clear that the legislature is to fund DHHL for purposes which reflect the spirit and intent of the [HHCA]. Your Committee decided to no longer allow the legislature discretion in this area.*

Your Committee decided that the legislature should provide sufficient funds to DHHL for the following projects:

1. For the development of site improvements for homes, agriculture, farm and ranch lots. Development shall include but not be limited to off-cite and on-site improvements which are necessary to provide grading, access (roads) and utility services (drainage, sewerage, water and electrical systems) for the developed lots;

2. For lessee loans in the areas of home construction and farm and ranch construction and equipment. Under this loan mandate, DHHL is authorized to request loans for lessees or native Hawaiians for agricultural purposes, which includes but is not limited to aquaculture;

3. For various rehabilitation projects, including education, social, political, economic and cultural processes which contribute to the general welfare and betterment of native Hawaiian conditions; and

4. For administrative and operational costs, which expenditure requests are to be utilized for all of the above-mentioned.

. . . .

Your Committee determined that DHHL has approximately 200,000 acres under its present land inventory (deleting congressional land withdrawals and land exchanges between DHHL and the Department of Land and Natural Resources). The intent of the [HHCA], inter alia, was to perpetuate the native Hawaiian race by encouraging Hawaiian people to return to the land to till the soil. The evil sought to be corrected was the depar-

ture of the Hawaiian people from the soil and the consequent weakening of their structure of society under the impact of western civilization. One of the basic causes of this departure was the fact that the Hawaiians did not actually receive one third of the domain which was supposed to have been set aside for them at the time of the Great Mahele, so that many persons had no land of their own when the change from feudal land tenures to common law land tenures was made.

*Yet, in the 57 years since passage of the [HHCA], less than 12–1/2 percent (25,000 acres) of the total "available lands" (200,-000 acres) have actually been disposed of to native Hawaiians. This averages about 435 acres of Hawaiian home lands per annum. At that rate, it would take over 400 years to lease the remaining 175,000 acres to native Hawaiians; by the year 2378 the last square foot of available land will be awarded to a native Hawaiian. Nearly 25 generations will have passed before the goal of the HHCA is fully realized.*

. . . .

Your Committee reports that there are nearly 60,000 native Hawaiians within the State and approximately 2,800 lessees have been placed on the land. There are more than 5,200 applicants on the waiting list for homes.

Stand. Comm. Rep. No. 56, in 1 *Proceedings of the Constitutional Convention on Hawaii* of 1978, at 630–31 (1980) (emphases added).

The Hawaiian Affairs Committee Report also expressed the committee's concern with the amount of the "available lands" being used by the general public and with the DHHL's leasing to the general public of land that could otherwise be used for awards to beneficiaries, in order to generate revenues to support the DHHL's administrative and operating budget. The Hawaiian Affairs Committee Report noted that of the approximately 200,000 acres under the DHHL's land inventory, 57 percent had been released to the general public; over 90,000 acres were in agricultural-related uses by the general public; over 16,000 acres were under Governor Executive Order and were used for public projects, with no income return from such lands; and over 44,000 acres were used by federal, state, and county government agencies. *Id.* at 631. The Hawaiian Affairs Committee Report further stated:

The department's current budget is approximately $1.3 million. Its revenue from general leases, licenses and revenue permits is approximately $1.1 million . . . .

The department presently general leases its lands to obtain moneys for administrative expenses and salaries. In order to keep up with a built-in inflation rate and to rehire prospective employees through SCET losses, DHHL continues to general lease more of its lands. These employees are necessary to keep up with the current housing output. DHHL averages 10 dollars per acre on its general leases.

*DHHL cannot afford to lease more acreage to the general public for the purpose of generating income to accommodate a minimal employee level.*

*It is clear to your Committee that the intent and spirit of the [HHCA] would be better moneys [sic] served by releasing the department of its present burden to generate revenues through the general leasing of its lands. Your Committee decided that through legislative funding this dilemma would be resolved. In that manner more lands could be made available to the intended beneficiaries.*

*Id.* at 631–32 (emphasis added).

Concerns raised in the Hawaiian Affairs Committee Report were echoed in the Committee of the Whole Report No. 11 (the "Committee of the Whole Report") on Committee Proposal No. 11, which included the "sufficient sums" amendment to Article XII, Section 1 proposed by the Committee on Hawaiian Affairs. The Committee of the Whole Report stated, in relevant part:

Your Committee recognized that the intent and purpose of [Committee Proposal] No. 11 is to provide the means to locate more Hawaiians on the lands specified for them through the Hawaiian Homes Commission Act, 1920, as amended. Your Committee learned that the department of Hawaiian home lands must finance its own

program through the general leasing of its lands and that it is the only one of 17 state departments which must fund itself. Therefore the land of any value through the years has been general leased for revenue purposes which are used by the department for its operating budget.

## VII.

In construing a constitutional provision, a court must give "due regard to the intent of the framers" and it may look to the "matters sought to be remedied" and the historical context in which the provision was adopted. *See Kaho'ohanohano,* 114 Hawai'i at 339, 162 P.3d at 733. In my view, the historical context of the 1978 amendment to Article XII, Section 1, the matters sought to remedied, and the intent of the framers as revealed in the Hawaiian Affairs Committee Report and the Committee of the Whole Report (collectively, the "Committee Reports") provide judicially discoverable and manageable standards for addressing the dispute over whether the Legislature has made sufficient sums available to the DHHL as required by Article XII, Section 1.

As noted, the 1978 amendment to Article XII, Section 1 was prompted by the framers' dissatisfaction with the prior extent of the progress being made in providing lands to native Hawaiian beneficiaries under the HHCA and the Legislature's funding support for the DHHL.[8] Accordingly, the level of the Legislature's funding support for the DHHL prior to 1978 combined with and viewed in the context of the level of the DHHL's progress in awarding lands to native Hawaiian beneficiaries prior to 1978 (the "pre–1978 levels") provide a means for deriving a minimum baseline or a floor for measuring and determining whether the Legislature has made sufficient sums available under Article XII, Section 1.[9] The framers also expressed their concern with the DHHL's leasing of land to the general public that could otherwise be used for awards to beneficiaries, in order to generate revenues to support the DHHL's administrative and operating budget.

The pre–1978 levels and the framers' intent, including their concern with the DHHL's leasing of lands to the general public, provide a context and a framework for a court to use in construing the meaning of "sufficient sums" as used in Article XII, Section 1. Accordingly, they provide a court with judicially discoverable and manageable standards for evaluating whether the Legislature has satisfied the "sufficient sums" requirement of Article XII, Section 1 without resort to nonjudicial policy determinations.

It is true that the pre–1978 levels and the framers' intent, as revealed in the Committee Reports, do not provide a means of determining with precision the amount of funding necessary to satisfy the "sufficient sums" requirement. However, contrary to Defendants' contention, I conclude that Plaintiffs' claims do not become nonjusticiable under the political question doctrine simply because a court cannot determine with precision or particularity how much money the Legislature is required to appropriate based on the constitutional provision.

It is the judiciary's role and responsibility to construe the constitution. *See State v. Nakata,* 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994). What is necessary for a court to fulfill its role is not precision, but discoverable and manageable standards. Adopting Defendants' position would mean that the framers had amended the Hawai'i Constitution to impose a mandatory funding obligation on the Legislature that had no substantive effect because the obligation could not be enforced. We should not, however, "ascribe to the constitutional framers the

---

8. The record does not contain specific information regarding the funding support provided by the Legislature to the DHHL prior to 1978. Appropriation acts enacted by the Legislature prior to 1978 indicate that the Legislature provided funds to the DHHL for various projects. *See, e.g.,* 1974 Haw. Sess. Laws Act 218; 1975 Haw. Sess. Laws Act 195; 1976 Haw. Sess. Laws Act 226; 1977 Haw. Sess. Laws Acts 9 and 10.

9. Legislative funding support would at least have to exceed, in relative terms, a minimum baseline or floor derived by reference to the pre–1978 levels before it could be considered to be sufficient.

intent to enact laws devoid of any real substance and effect." *See In re Water Use Permit Applications,* 94 Hawai'i at 142, 9 P.3d at 454. I agree with Plaintiffs that a court may be able to conclude that the Legislature's level of funding is "plainly insufficient" under Article XII, Section 1 without determining "precisely how much money would be sufficient for DHHL" under that provision. For example, legislative funding the relative amount of which fell below a minimum baseline or floor derived by reference to the pre–1978 levels would plainly be insufficient, even if a court could not determine the precise amount that would be sufficient under Article XII, Section 1.

## VIII.

Article XII, Section 1 imposes on the Legislature the obligation to make "sufficient sums" available for the identified purposes. As reflected in the Committee Reports, the framers' dissatisfaction with the prior extent of the progress in awarding land to native Hawaiian beneficiaries and the Legislature's funding support for the DHHL; their concern with the DHHL's leasing of land to the general public that could otherwise be used for awards to beneficiaries, in order to generate revenues to support the DHHL's administrative and operating budget; and their other expressions of intent provide reference points and a basis for a court to evaluate whether the Legislature has made "sufficient sums" available under Article XII, Section 1. Defendants argue that enforcing the "sufficient sums" requirement could bankrupt the State if it is construed in a way that ignored the State's competing budget requirements and economic conditions. However, nothing in the language of Article XII, Section 1 or the Committee Reports suggests that economic reality, the State's budgetary limitations, or the State's economic circumstances should be ignored in construing the "sufficient sums" requirement.

It becomes harder to evaluate whether the Legislature has satisfied the "sufficient sums" requirement of Article XII, Section 1 as the Legislature's funding support rises above levels that are plainly insufficient. However, in my view, the solution is not to decline to address Plaintiffs' claims, but to recognize that the judgments of the Legislature and the DHHL are entitled to reasonable deference and more latitude as the Legislature's funding support for the DHHL rises above levels that are plainly insufficient. This is consistent with the well-established standard used by the courts in reviewing the constitutionality of legislative enactments. Legislative enactments are "presumptively constitutional," and a party challenging a statute enacted by the Legislature "has the burden of showing unconstitutionality beyond a reasonable doubt." *Kaho'ohanohano,* 114 Hawai'i at 339, 162 P.3d at 733.

## IX.

Because the circuit court dismissed Plaintiffs' claims in Counts 1 and 2 based on the political question doctrine, it did not address the merits of those claims. The record was not fully developed on the issue of whether the Legislature had satisfied its obligation to make sufficient sums available for the purposes identified in Article XII, Section 1. For example, the record did not contain detailed information regarding the pre–1978 levels or an analysis of how the pre–1978 levels could be used to derive a minimum baseline or floor to assist in the evaluation of whether the Legislature has made sufficient sums available to the DHHL. Nor did the record address in detail the justifications for the DHHL's general leasing programs and for the funding support provided by the Legislature for the DHHL's administrative and operating budget, given the concerns raised in the Committee Reports, or whether lands that should reasonably be used for awards to native Hawaiian beneficiaries have been leased to the general public to generate revenues to support the DHHL's administrative and operating budget.

On remand, the parties should provide the circuit court with evidence and analysis that permits it to evaluate whether the Legislature has satisfied the "sufficient sums" requirement in light of the purpose and intent of the framers of Article XII, Section 1. It is

incumbent upon the Legislature to provide, and the DHHL to request, funding that satisfies the Legislature's obligation to make sufficient sums available to the DHHL under Article XII, Section 1. It is also incumbent upon the Legislature and the DHHL to justify their actions in light of the obligation imposed by Article XII, Section 1.