277 P.3d 279

Richard NELSON III, Kaliko Chun, James Akiona, Sr., Sherilyn Adams, Kelii Ioane, Jr., and Charles Aipia (deceased), Respondents/Plaintiffs/Appellants,

v.

HAWAIIAN HOMES COMMISSION, The Department Of Hawaiian Home Lands, Alapaki Nahale-a, in his official capacity as Chair of the Hawaiian Homes Commission, Imaikalani P. Aiu, Perry Artates, Leimana K. Damate, Jeremy Kamakaneoaloha Hopkins, Michael P. Kahikina, Ian Lee Loy, Henry K. Tancayo, and Renwick V.I. Tassill, in their official capacities as members of the Hawaiian Homes Commission,[1] Respondents/Defendants/Appellees,

and

Kalbert K. Young, in his official capacity as the State Director of Finance, and the State of Hawai'i, Petitioners/Defendants/Appellees.

No. SCWC–30110.

Supreme Court of Hawai'i.

May 9, 2012.

---

1. During the pendency of this action, Alapaki Nahale-a succeeded Kaulana H.R. Park as the

Chair of the Hawaiian Homes Commission; and Michael P. Kahikina and Renwick V.I. Tassill succeeded Trish Morikawa and Donald S.M. Chang as members of the Hawaiian Homes Commission. Thus, pursuant to Hawaiʻi Rules of Appellate Procedure Rule 43(c)(1), Nahale-a, Kahikina, and Tassill have been substituted automatically for Park, Morikawa, and Chang in this case.

David M. Louie, Attorney General, and Girard D. Lau and Charleen M. Aina, Deputy Attorneys General, for Petitioners/Defendants–Appellees.

David Kimo Frankel and Alan T. Murakami (Native Hawaiian Legal Corporation), for Respondents/Plaintiffs–Appellants.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, DUFFY, and McKENNA, JJ.

Opinion of the Court by McKENNA, J.

## I. Introduction

We are presented with one question:

Does the political question doctrine bar Hawaiian Homes Commission Act (HHCA) beneficiaries from using Haw. Const. Article XII, Section 1's "sufficient sums" provision to demand more legislative funding of the Department of Hawaiian Home lands (DHHL), when that provision provides no guidance at all as to how quickly homesteads must be developed?

At issue is the interpretation of Article XII, Section 1 of the Hawai'i State Constitution, which now provides:

> Anything in this constitution to the contrary notwithstanding, the Hawaiian Homes Commission Act, 1920, enacted by the Congress, as the same has been or may be amended prior to the admission of the State, is hereby adopted as a law of the State, subject to amendment or repeal by the legislature; provided that if and to the extent that the United States shall so require, such law shall be subject to amendment or repeal only with the consent of the United States and in no other manner; provided further that if the United States shall have been provided or shall provide that particular provisions or types of provisions of such Act may be amended in the manner required for ordinary state legislation, such provisions or types of provisions may be so amended. The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms and spirit of such Act. *The legislature shall make sufficient sums available for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3) and (4) herein, by appropriating the same in the manner provided by law.*

> Thirty percent of the state receipts derived from the leasing of cultivated sugarcane lands under any provision of law or from water licenses shall be transferred to the native Hawaiian rehabilitation fund, section 213 of the Hawaiian Homes Commission Act, 1920, for the purposes enumerated in that section. Thirty percent of

the state receipts derived from the leasing of lands cultivated as sugarcane lands on the effective date of this section shall continue to be so transferred to the native Hawaiian rehabilitation fund whenever such lands are sold, developed, leased, utilized, transferred, set aside or otherwise disposed of for purposes other than the cultivation of sugarcane. There shall be no ceiling established for the aggregate amount transferred into the native Hawaiian rehabilitation fund.

We hold that the 1978 Constitutional Convention history provides judicially discoverable and manageable standards, as well as initial policy determinations, as to what constitutes "sufficient sums" for DHHL's administrative and operating expenses only; therefore, judicial determination of "sufficient sums" as to that purpose under Article XII, Section 1 of the Hawai'i State Constitution is not barred as a nonjusticiable political question, and the ICA did not err in so holding. However, Article XII, Section 1 and the 1978 Constitutional Convention do not shed light on what would constitute "sufficient sums" for (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; and (3) rehabilitation projects. Therefore, the political question doctrine bars judicial determination of what would constitute "sufficient sums" for those purposes, and the ICA erred in concluding otherwise.

## II. Background

### A. The Hawaiian Homes Commission Act; Article XII, Section 1 of the Hawai'i Constitution; and the 1978 Constitutional Convention

Concerned about the condition of the native Hawaiian people, Congress enacted the Hawaiian Homes Commission Act ("HHCA") in 1921 to set aside about 203,500 acres of ceded lands for native Hawaiian homesteads. Hawaiian Homes Commission Act, 1920, 67 Pub L. 34, 42 Stat. 108 (1921); see also Rice v. Cayetano, 528 U.S. 495, 507, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000). Prince Jonah Kuhio Kalanianaole, Hawai'i's congressional delegate at the time, was instrumental in shepherding the Act through Congress, argu-

ing that native Hawaiians "were entitled to a share of the lands that had been 'ceded' from the Republic of Hawaii to the United States in 1898 because they had not obtained their fair share of the lands distributed during the Mahele." Jon Van Dyke, Who Owns the Crown Lands of Hawai'i? 239–40 (2008). Prince Kuhio spoke of the native Hawaiians' right to the land as follows: "Perhaps we have a legal right, certainly we have a moral right, to ask that these lands be set aside. We are not asking that what you are to do be in the nature of a largesse or as a grant, but as a matter of justice—belated justice." Id. at 241.

Under the Act, native Hawaiians (those of fifty percent blood quantum or more) could obtain 99–year leases for a dollar a year for residential, pastoral, and agricultural lots. See Native Hawaiian Rights Handbook 43 (Melody Kapilialoha MacKenzie ed., 1991). One purpose of the HHCA was to "save" the native Hawaiian race by "tak[ing] [native Hawaiians] back to the lands and giv[ing] them the mode of living that their ancestors were accustomed to and in that way rehabilitate them." Ahuna v. Dept. of Hawaiian Home Lands, 64 Haw. 327, 336 n. 10, 640 P.2d 1161, 1167 n. 10 (1982) (quoting Senator John H. Wise, H.R.Rep. No. 839, 66th Cong., 2d Sess. 4 (1920)).

The Act also appeased Hawai'i's large-scale agricultural interests at the time. Hundreds of thousands of acres of prime agricultural land leased to these sugar and ranching interests were set to expire between 1917 and 1921, and the passage of the Act prevented the return of those lands to the pool of land available for homesteading. See Native Hawaiian Rights Handbook 45. In fact, the Act specifically designated cultivated cane lands as unavailable for Hawaiian homesteads. See id. at 17 (citing HHCA § 203). The lands remaining for Hawaiian homesteads were "arid and of marginal value," and many were "actually lava rock." Id. Most of the land was in "remote locations," on the "dry, leeward side of each island, generally with poor soils and rough terrain, more difficult and costly to develop," and without water—parcels famously described as "lands that a goat couldn't live on." Van

Dyke, *Who Owns the Crown Lands of Hawai'i?* 248. Diversified agriculture did not succeed on these lands; consequently, the homestead program focused its attention on providing houselots and some pasture lands. *See Native Hawaiian Rights Handbook* 17–18.

In 1959, Hawai'i entered the union. As a condition of admission to statehood, the federal government conveyed the 200,000+ acres of home lands to the State, and the State was required to adopt the HHCA under its constitution. *See* Haw. Const. Art. XII, § 2. Through Section 2, the State of Hawai'i "accepted specific trust obligations relating to the management of the Hawaiian home lands imposed by the federal government." *Ahuna*, 64 Haw. at 337, 640 P.2d at 1168.

Before the Constitutional Convention of 1978, the last sentence of the first paragraph of Article XI, Section 1 of the Hawai'i Constitution, which related to how the State should fund DHHL to fulfill its trust obligations, read as follows:

> The proceeds and income from Hawaiian home lands shall be used only in accordance with the terms of said Act, and *the legislature may, from time to time, make additional sums available for the purposes of said Act* by appropriating the same in the manner provided by law.

(emphasis added). Accordingly, the Legislature, prior to 1978, had discretion to fund (or not fund) DHHL.

Unfortunately, the State was not much more successful than the federal government in fulfilling its constitutional duties. *See Kalima v. State*, 111 Hawai'i 84, 88, 137 P.3d 990, 994 (2006). In 1979, the Hawai'i electorate voted to amend Article XI, Section 1, renumbered as Article XII, Section 1, to replace the last sentence of the first paragraph, quoted above, with the following language:

> The legislature *shall make sufficient sums available* for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) re-

habilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3), and (4) herein, by appropriating the same in the manner provided by law.

(emphasis added). Thus, through this amendment, the discretionary funding language was changed to mandatory funding language.

Nearly three decades after the 1978 Hawai'i Constitutional Convention, Article XII, Section 1 and its constitutional convention history serve as the basis for Plaintiffs' claims for relief.

## B. Procedural History
### 1. Plaintiffs' First Amended Complaint

On October 19, 2007, Plaintiffs Richard Nelson III, Kaliko Chun, James Akiona, Sr., Sherilyn Adams, Kelii Ioane, Jr., and Charles Aipia ("Plaintiffs") filed a First Amended Complaint for Declaratory and Injunctive Relief ("FAC") against Defendants Georgina K. Kawamura, in her official capacity as the State Director of Finance; the State of Hawai'i (collectively, "State Defendants"); the Hawaiian Homes Commission; the Department of Hawaiian Home Lands; Micah Kane, in his official capacity as Chair of the Hawaiian Homes Commission; and Perry Artates, Billie Baclig, Donald S.M. Chang, Stuart Hanchett, Malia Kamaka, Francis Lum, Trish Morikawa, and Milton Pa, in their capacities as members of the Hawaiian Homes Commission ("DHHL Defendants").[2] In their FAC, the Plaintiffs set forth the following factual summary of the current state of affairs of the Hawaiian Home Lands:

> [T]he Hawaiian Homes Commission, the Department of Hawaiian Home Lands and the State of Hawai'i have ignored this mandate [that the legislature shall make sufficient sums available to the DHHL to carry out its mission of rehabilitating native Hawaiian beneficiaries]. The State of

2. The original complaint was filed on September 6, 2007.

Hawai'i has failed to provide sufficient funds to the Department of Hawaiian Home Lands to minimize the number and waiting time on its waiting lists for homesteads to a reasonable level. Instead of obtaining necessary funds from the Legislature, the Hawaiian Homes Commission and the Department of Hawaiian Home Lands have continued to offer commercial leases to non-Hawaiian entities in order to raise revenue. This removal of Hawaiian Home Lands from use by beneficiaries of the Hawaiian Home Lands Trust, and the failure to seek sufficient funds[,] are breaches of the State Constitution and the trust.

Because the State of Hawai'i has failed to provide sufficient funds to the Department of Hawaiian Home Lands, the Department and the Hawaiian Homes Commission have improperly attempted to lease approximately 200 acres of land at Kealakehe on Hawai'i Island in order to raise revenues.

Plaintiffs alleged in Count 1 of the FAC that the State violated its constitutional duty to *sufficiently fund* the Department of Hawaiian Home Lands in order to rehabilitate native Hawaiian beneficiaries, under the Hawai'i State Constitution.

Plaintiffs further alleged the following in Count 1 of the FAC:

61. In 1979, the voters of Hawai'i ratified an amendment passed by the 1978 Hawai'i Constitutional Convention delegates which specifically required the Legislature to provide the Department of Hawaiian Home Lands "sufficient sums" to pay for its trust programs and operating budget.

62. Under Haw. Const., Art. XII, § 1, the legislature must make sufficient funds available for the following purposes:

(1) development of home, agriculture, farm and ranch lots;

(2) home, agriculture, aquaculture, farm and ranch loans;

(3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3), and

(4) herein, by appropriating the same in the manner provided by law.

63. Furthermore, under the Hawaiian Homes Commission Act § 219.1, the Defendants are obligated to assist the lessees in obtaining maximum use of their leased lands, including taking any steps necessary to develop these lands for their highest and best use commensurate with the purposes for which the land is being leased, and assisting the lessees in all phases of farming, ranching, and aquaculture operations and the marketing of their agriculture [or] aquacultural produce and livestock.

64. Hawaiian homestead beneficiaries cannot achieve the lofty aims of the Hawaiian Homes Commission Act unless they are awarded homesteads timely and provided sufficient assistance to maximize their utilization of those lands for the purposes set out in the Hawaiian Homes Commission Act.

65. Payments made pursuant to Act 14, 1995 Special Session, do not diminish funds that the Department of Hawaiian Home Lands is entitled to pursuant to Article XII, section 1 of the Constitution of the State of Hawai'i.[3]

66. Accordingly, the compensation for the past breaches of trust by the State under Act 14 is exclusive of the "sufficient sums" to which the DHHL is entitled pursuant to Article XII, section 1 of the Constitution of the State of Hawai'i.

67. The infrastructure cost to develop Hawaiian Home Land lots on average is approximately $100,000 per lot.

---

3. Act 14 of the 1995 Special Session provided DHHL with $600,000,000 (payable in $30,000,000 increments over 20 years) to compensate the department for lands improperly conveyed during the territorial period. *See* 1995

Haw. Sess. Laws Act 14, at 696–703. Act 14 specifically states, "Payments made under this Act shall not diminish funds that the department is entitled to under article XII, section 1, of the Constitution of the State of Hawaii." *Id.* at 701.

68. According to Hawaiian Homes Commission Chair Micah Kane, "The model is there, the projects are there, the momentum is there. Now, it's just an issue of money."

69. According to Hawaiian Homes Commission Chair Micah Kane, a conservative estimate of the funding necessary for infrastructure to place one thousand homesteaders each on homestead lands each year is $100,000,000 annually.

70. In contrast, other than the funding provided pursuant to Act 14, the Department of Hawaiian Home Lands received less than one and a half million dollars in general revenue funds from the legislature for fiscal year 2007.

71. Simultaneously, since 1994, the State of Hawai'i has [neither] floated nor issued any capital improvement bond financing to support the need for additional DHHL infrastructure.

72. The Department of Hawaiian Home Lands does not currently receive sufficient funding to develop house lots for all applicants on the waiting list.

73. The Department of Hawaiian Home Lands does not currently receive sufficient funding to reduce the waiting list by ninety percent over the next decade.

74. The Department of Hawaiian Home Lands does not currently receive sufficient funding to pay for the development of homesteads for applicants on the waiting list within a reasonable time frame.

75. The Department of Hawaiian Home Lands does not currently receive sufficient funds for the following purposes: (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to,

educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; (4) the administration and operating budget of the department of Hawaiian home lands; in furtherance of (1), (2), (3) and (4) herein.

76. The state administration fails to annually request "sufficient sums" for the administration and operating budget of the Department of Hawaiian Home Lands to assure that the all [sic] programs of the department prescribed under Article XII, § 1 are adequately funded.

77. Accordingly, Plaintiffs are entitled to a declaration by this court that Defendants are in breach of their duties under Article XII, §§ 1 and 2.

78. Plaintiffs are also entitled to a mandatory injunction requiring the State to provide sufficient funds to the Department of Hawaiian Home Lands to (a) place as many beneficiaries on the department's waiting lists for residences, farms, and ranches on available Hawaiian home lands within a reasonable period of time; (b) fund a fully functioning farm, ranch, and aquaculture support program to enable homesteaders to maximize the utilization of their homestead lots.

Thus, Count 1 of the FAC alleged that the State failed to *make available* sufficient sums to the DHHL, in violation of Article XII.[4] The Plaintiffs also sought injunctive relief in the form of sufficient sums awarded to DHHL to enable as many applicants on the waiting list as possible to receive homestead lots within a reasonable period of time.

### 2. The State's Motion for Summary Judgment

On September 10, 2008, the State filed its Motion for Summary Judgment, arguing first

---

**4.** Count 2 of the FAC alleged that the DHHL Defendants breached their trust obligation to their beneficiaries to *seek* sufficient funds from the legislature. In Count 3, Plaintiffs alleged that the DHHL Defendants breached their trust obligations to their beneficiaries and their constitutional duties by leasing DHHL lands for commercial purposes to raise funds. Lastly, in Count 4, Plaintiffs alleged that the DHHL Defendants breached their obligation to their beneficiaries by failing to ascertain whether trust lands were necessary for general homestead purposes

before offering them for commercial lease. The parties stipulated to dismiss Counts III and IV without and with prejudice, respectively.

Only Count 1 is at issue in this appeal, as Count 2 was alleged against only the DHHL Defendants, who did not apply for a writ of certiorari or file a response to the State's application for writ of certiorari. As a practical matter, however, the ICA's judgment vacated the entire circuit court judgment and remanded the entire case for a decision on the merits, which reopened all the Counts.

that it had no trust obligation to fund the DHHL. The thrust of the State's Motion for Summary Judgment, however, was its assertion that "[a]ny claim that the Hawai'i Legislature has an obligation under Article XII, Sections 1 & 2, of the Hawai'i Constitution to provide a certain level of money to DHHL is barred by the Political Question Doctrine."

On October 3, 2008, the DHHL Defendants filed their Substantive Joinder in the State's Motion for Summary Judgment. DHHL argued that if the court were to grant summary judgment in favor of the State on Count 1 (alleging that the State is required to make available sufficient sums to DHHL), then partial summary judgment should be granted in favor of DHHL on Count 2 (alleging that DHHL is obligated to request sufficient sums from the State). On October 14, 2008, the Plaintiffs filed their Memorandum in Opposition to the State's Motion for Summary Judgment, requesting that the circuit court "deny the State Defendants' motion for summary judgment [and, instead] grant summary judgment on this issue to Plaintiffs pursuant to *Flint v. MacKenzie*, 53 Haw. 672, 501 P.2d 357 (1972)."

On January 21, 2009, the circuit court granted the State's Motion for Summary Judgment, stating:

Although Plaintiffs raised allegations that were of concern to this Court, the Court finds that the political question doctrine bars justiciability of Plaintiffs' claims. There are no judicially discoverable and manageable standards for resolving the dispute over the definition and determination of "sufficient sums" under Article XII,

Sections 1 & 2, of the Constitution of the State of Hawai'i, without making initial policy determinations of a kind clearly for nonjudicial discretion.

On January 22, 2009, the circuit court granted the DHHL Defendants' substantive joinder in the State's motion.[5]

On August 24, 2009, the parties entered into a Stipulation to Dismiss Count 3 without prejudice and Count 4 with prejudice. With all counts disposed of, the circuit court entered Final Judgment on September 23, 2009. Plaintiffs timely appealed to the ICA.

### 3. The ICA Opinion

In a published opinion authored by Judge Foley and joined by Judge Fujise, the ICA concluded that the Plaintiffs' claims were not barred by the political question doctrine, vacated the circuit court's judgment, and remanded the case for further proceedings consistent with its opinion. *See Nelson v. Hawaiian Homes Comm'n*, 124 Hawai'i 437, 447, 246 P.3d 369, 379 (App.2011). The majority concluded that the determination of "sufficient sums" did not pose a political question as to all four purposes enumerated in Article XII, Section 1, analyzing the issue with reference to all six formulations of the political question doctrine set forth in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), as adopted by *Trustees of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 737 P.2d 446 (1987). 124 Hawai'i at 445–47, 246 P.3d at 377–79.

5. On January 30, 2009, Plaintiffs filed a Motion to Reconsider Summary Judgment Orders, and on February 20, 2009, Plaintiffs filed a Supplemental Memorandum to their Motion to Reconsider Summary Judgment Orders. Plaintiffs presented to the court "new evidence" intended to show that the State admitted that DHHL was insufficiently funded: the State of Hawai'i Department of Budget and Finance's FB 2009–11 Executive Biennium Budget: Budget in Brief, in which the State purportedly admits that funding to DHHL has not been sufficient; the budget's proposed deletion of general funds for 18 DHHL staff positions; DHHL's estimate that $2 billion is needed to address the housing needs of residential applicants on the waiting list; and an estimate that only 210 homestead lots (or homestead lots for only 1.04% of those on the waiting

list) will be awarded in an eight year period. The Plaintiffs also pointed to a recently decided case, *Hanabusa v. Lingle*, 119 Hawai'i 341, 198 P.3d 604 (2008), and argued that the case established a reasonableness standard for wait time. Lastly, the Plaintiffs produced as "new evidence" testimony of DHHL Chairman Micah Kane before the state legislature, in which he stated that DHHL's administrative and operating costs would be wholly funded by its special and trust funds instead of through general funds. The State and DHHL defendants continued to counter-argue that what constituted "sufficient sums" remained a political question; they also argued that the holding of the *Hanabusa* case is limited to the context of gubernatorial appointments. The circuit court denied Plaintiff's Motion to Reconsider by order dated March 17, 2009.

With respect to the two *Yamasaki* formulations emphasized by the State, the majority stated that the DHHL's 1976 General Plan provided the "initial policy determinations" and set forth "judicially discoverable and manageable standards" by which "sufficient sums" can be determined, rendering the controversy justiciable. 124 Hawai'i at 445–46, 246 P.3d at 377–78.

Chief Judge Nakamura concurred separately and posited:

> [T]he level of the Legislature's funding support for the DHHL prior to 1978 combined with and viewed in the context of the level of the DHHL's progress in awarding lands to native Hawaiian beneficiaries prior to 1978 (the "pre–1978 levels") provide a means for deriving a minimum baseline or a floor for measuring and determining whether the Legislature has made sufficient sums available under Article XII, Section 1.

124 Hawai'i at 452, 246 P.3d at 384 (Nakamura, C.J., concurring). To Chief Judge Nakamura, the pre–1978 levels serve as judicially discoverable and manageable standards for evaluating whether the legislature has provided sufficient sums without resort to nonjudicial policy determinations. *See id.* In order to fulfill the constitutional mandate, then, "[l]egislative funding support [to DHHL] would at least have to exceed, in relative terms, a minimum baseline or floor derived by reference to the pre–1978 levels before it could be considered to be sufficient." 124 Hawai'i at 452 n. 9, 246 P.3d at 384 n. 9 (Nakamura, C.J., concurring). The State now appeals.

#### 4. Certiorari

On certiorari, the State argues that Count 1 raises a political question because Article XII, Section 1 sheds no light on how many lots ("N") must be developed in a certain period of time; therefore, the "sufficient sums" needed to develop N lots are not subject to a "judicially discoverable and manageable standard." The State also argues that, even if a known number were referenced by the court (such as the number of applicants on the waiting list), Article XII, Section 1 still sheds no light on what a reasonable time period ("Y") would be for an applicant to remain on the waiting list; therefore, in making such a determination, the State argues that the court would resort to making "initial policy determinations of a kind clearly for nonjudicial discretion."

The State also argues that similar problems exist in determining what are "sufficient sums" for home, agriculture, aquaculture, farm and ranch loans; rehabilitation projects for native Hawaiians; and the administrative and operating budget of DHHL. In short, the State argues that the language of Article XII, Section 1 provides no guidance whatsoever to the court on how to determine what "sufficient sums" to DHHL are for all four of its constitutionally defined purposes.

The State also argues that the constitutional history behind the provision similarly provides no guidance to the court. First, it asserts the committee report advocating releasing DHHL of the burden of leasing its own lands to raise funds for administrative staff is still silent on how much funding DHHL should get as a whole. Second, the State argues that the 1976 DHHL General Plan does not set a current standard by which "sufficient sums" can be measured. Next, the State asserts that the removal of legislative discretion in funding DHHL still fails to provide a clue as to how much funding "sufficient sums" would be. Lastly, the State rejects Chief Judge Nakamura's suggestion that pre–1978 funding levels serve as the floor against which current funding could be compared, as it still leaves unresolved policy determinations inappropriate for a court to make, especially in light of the current fiscal crisis. In short, the State argues that the ICA gravely erred in holding that determination of "sufficient sums" for all four purposes under Article XII, Section 1 is justiciable.

In their Response, Plaintiffs ask this court to answer in the negative the question of whether the State has provided "sufficient sums" to DHHL. Plaintiffs further state that the determination of "sufficient sums" does not turn on mathematical certainty regarding the number of lots or the length of the wait time, as the State Defendants argue. Rather, the Plaintiffs argue that by any reason-

able standard—the small number of lots leased, the thousands of applicants on the waiting list, the length of the wait, etc.—the State cannot be said to have given "sufficient sums" to DHHL for it to carry out its mission. They argue that this situation existed at the time of the 1978 Constitutional Convention, and it was what the framers intended to remedy in amending Article XII, Section 1.

According to Plaintiffs, the judicially discoverable and manageable standards enunciated by the delegates in determining sufficient sums was enough money to alleviate the burden of general leasing land for revenue, implement the 1976 DHHL General Plan, fulfill DHHL's administrative needs as well as its goal of providing every qualified native Hawaiian beneficiary on the waiting lists an opportunity for homeownership or land stewardship on homestead lands, all without unreasonable delay. Lastly, the Plaintiffs argue that the initial policy decision to sufficiently fund DHHL was made by the voters in 1978. Thus, to the Plaintiffs, the political question doctrine does not apply to this case.

## III. Discussion

### A. Development of the Political Question Doctrine

■ The political question doctrine is often considered "the most amorphous aspect of justiciability[.]" *Nishitani v. Baker*, 82 Hawai'i 281, 290, 921 P.2d 1182, 1191 (App. 1996) (citation omitted). The doctrine is the result of the balance courts must strike in preserving separation of powers yet providing a check upon the other two branches of government. *Yamasaki*, 69 Haw. at 171, 737 P.2d at 456. This court adopted the test enunciated by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) as its own test in *Yamasaki*, 69 Haw. 154, 737 P.2d 446. The test states:

Prominent on the surface of any case held to involve a political question is found[:(1)] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and man-

ageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Yamasaki*, 69 Haw. at 170, 737 P.2d at 455 (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691). Unless any of these formulations is inextricable from the case at bar, dismissal for nonjusticiability is unwarranted. *See id.*

An analysis into whether Plaintiffs' claim poses a nonjusticiable political question requires some background into this court's development of the political question doctrine, in which two pairs of cases have come to a head. In the first pair of cases, *Yamasaki* and *OHA*, this court determined controversies to be nonjusticiable political questions. *See Yamasaki*, 69 Haw. 154, 737 P.2d 446, and *Office of Hawaiian Affairs v. State*, 96 Hawai'i 388, 31 P.3d 901 (2001). The State cites these cases as analogous to the instant appeal. In the second pair of cases, *Waihee* and *Kaho'ohanohano*, this court determined controversies were not foreclosed from judicial review by the political question doctrine. *See Board of Education v. Waihee*, 70 Haw. 253, 768 P.2d 1279 (1989), and *Kaho'ohanohano v. State*, 114 Hawai'i 302, 162 P.3d 696 (2007). Plaintiffs cite these cases as more analogous to the instant appeal.

### 1. *Yamasaki* and *OHA*

In *Yamasaki*, the OHA Trustees initiated two lawsuits, which were consolidated, against state officials and a public corporation. 69 Haw. at 157, 737 P.2d at 448. The trustees sought declaratory and injunctive relief on the basis that OHA was entitled to 20% of the income derived from the State's dispositions of ceded lands, pursuant to HRS § 10–13.5, which stated that "[t]wenty per cent of all funds derived from the . . . trust

... shall be expended by [OHA]" for the purposes set forth in HRS § 10-3, which include the betterment of conditions of native Hawaiians. 69 Haw. at 157–58, 737 P.2d at 448–49. In the first of the consolidated lawsuits, the OHA plaintiffs sought a declaration that OHA was entitled to 20% of the proceeds received by the State, or an undivided 20% of the land conveyed to the State in lieu of proceeds, as a result of illegal sand mining at Papohaku Beach, allegedly situated on ceded lands included in the public trust. *See* 69 Haw. at 165–166, 737 P.2d at 453. In the second of the consolidated lawsuits, the OHA plaintiffs sought a declaration that OHA was entitled to 20% of the income derived by the State from sales, leases, or other dispositions of ceded lands, principally located in the lands surrounding the State's harbors, such as Sand Island, the Honolulu International Airport, and Aloha Tower, pursuant to HRS § 10–13.5. *See* 69 Haw. at 166, 737 P.2d at 453.

This court dismissed both consolidated lawsuits as nonjusticiable under the political question doctrine. *See* 69 Haw. at 175, 737 P.2d at 458. We concluded that the disputes, which at first glance appeared to involve statutory interpretation of HRS § 10–13.5, did not, in actuality,

> constitute traditional fare for the judiciary; and if the circuit court ruled on them, it would be intruding in an area committed to the legislature. It would be encroaching on legislative turf because the seemingly clear language of HRS § 10–13.5 actually provides no "judicially discoverable and manageable standards" for resolving the disputes and they cannot be decided without "initial policy determination[s] of a kind clearly for nonjudicial discretion."

69 Haw. at 173, 737 P.2d at 457 (citation omitted). This was because the legislature had acknowledged for itself, in enacting Chapter 10 (concerning the Office of Hawaiian Affairs), that it left "much ... to subsequent legislatures, the Office of Hawaiian Affairs, and its board of trustees to work out the appropriate boundaries of the public trust." *Id.* (citing S. Stand. Comm. Rep. No. 784, in 1979 Senate Journal, at 1353). This court recounted that, three years later, four separate committees from a "subsequent legislature" admitted that there remained

> many uncertainties surrounding the matter of ceded lands and the disposition of revenues generated by the use of ceded lands can best be resolved by ascertaining what and where ceded lands exist, the legal and fiscal problems which may exist or arise from their use, and the effect on all parties concerned with the use and distribution of revenues generated from ceded lands.

*Id.* The committees recommended having the State Auditor tackle the unanswered questions. *See* 69 Haw. at 174, 737 P.2d at 457. A year later, the State Auditor abandoned the task, concluding that "the work ... is enormous," *id.*, and that "the uncertainties surrounding the trust and funds derived therefrom cannot be resolved without further legislative action." 69 Haw. at 174, 737 P.2d at 457–58. This uncertainty led this court to conclude, as to the OHA Plaintiffs' first consolidated lawsuit, that there existed no "judicially discoverable and manageable standards" to resolve the issue of whether damages from illegal sand mining, or a land conveyance in lieu of damages, constituted "funds derived from the public land trust" under HRS § 10–3, without making "an initial policy determination by the court." 69 Haw. at 174, 737 P.2d at 458.

As to the OHA Plaintiffs' second consolidated lawsuit in the *Yamasaki* case, this court concluded that the mandate contained in HRS § 10–13.5 (that OHA receive 20% of the funds derived from the public land trust) conflicted, in the case of lands sited within harbors, such as the airport, with HRS § 261–5, which directed that all moneys received by the State in connection with the airport be used to repay State bondholders, who finance the construction of the harbors and airports. 69 Haw. at 175, 737 P.2d at 458. This court concluded that there were no "judicially discoverable and manageable standards" that could be employed to resolve the conflict between the mandates of HRS §§ 10–13.5 and 261–5. *Id.* Therefore, it remanded both consolidated lawsuits to the circuit court for the entry of dismissal orders, as both claims posed nonjusticiable political questions. *Id.*

Fourteen years later, in *Office of Hawaiian Affairs v. State,* the OHA Trustees again brought suit seeking 20% of the revenues generated by the airport, which sits partially on ceded lands (and partially on federal lands), pursuant to HRS §§ 10–2 and 10–13.5, as amended by Act 304 of the 1990 legislative session. *See* 96 Hawai'i 388, 389, 31 P.3d 901 (2001). The legislature had responded to the *Yamasaki* decision by passing Act 304, which entitled OHA to 20% of the "revenue" (replacing the undefined and ambiguous word "funds") from ceded lands, and which defined "revenue" as "proceeds, fees, charges, rents, or other income . . . derived from any . . . activity[ ] that is situated upon and results from the actual use of . . . the public land trust[.]" 96 Hawai'i at 391–92, 31 P.3d at 904–05. The federal government, however, had also responded to *Yamasaki* by passing the Forgiveness Act, in which it declared, "There shall be no further payment of airport revenues for claims related to ceded lands[.]" 96 Hawai'i at 393, 31 P.3d at 906. Under Act 304's own terms, any conflict with federal law would invalidate the Act, and HRS § 10–13.5 would revert to its pre-Act 304 form. 96 Hawai'i at 394, 31 P.3d at 907. This court then concluded that Act 304 did conflict with federal law, was therefore invalidated, and that HRS §§ 10–2 and 10–13.5 reverted to prior versions—the versions that this court had already decided not to interpret because of a lack of judicially discoverable and manageable standards. 96 Hawai'i at 400, 31 P.3d at 913. Therefore, we dismissed the case for lack of justiciability under the political question doctrine. 96 Hawai'i at 401, 31 P.3d at 914.

Both *Yamasaki* and *OHA* emphasize that when an issue is committed to the legislature (such as determining the boundaries of the ceded lands trust, the nature of the funds derived from the trust, and the interaction between statutes dealing with funds generated from activities on ceded lands), when the legislature remains uncertain about the subject matter at issue, or when resolution of the uncertainty has already been committed to the legislature, the political question doctrine bars court review of an issue.

## 2. *Waihee* and *Kaho'ohanohano*

On the other hand, Plaintiffs cite to another pair of cases in which this court has concluded that the political question doctrine does not bar judicial review of a controversy: *Board of Education v. Waihee,* 70 Haw. 253, 768 P.2d 1279 (1989), and *Kaho'ohanohano v. State,* 114 Hawai'i 302, 162 P.3d 696 (2007).

In *Waihee,* the Board of Education ("Board") sought declaratory and injunctive relief on the ground that the Governor and Director of Finance impermissibly interfered with the Board's policymaking powers, granted to it under Article X, Section 3 of the State Constitution. 70 Haw. at 257, 262, 768 P.2d at 1282, 1285. The gravamen of Plaintiffs' complaint was that the Governor and Director of Finance, in reviewing and amending the Board's budget, interfered with the Board's ability to formulate policy and determine its own program priorities. 70 Haw. at 267, 768 P.2d at 1288. This court distinguished *Waihee* from *Yamasaki,* stating:

Alleging the Governor and the Director had interfered with and usurped the powers vested in the Board by article X, section 3 of the State Constitution, the plaintiffs sought a declaration of "the powers of the BOARD to formulate policy and exercise control over the public school system and the internal organization and management of that system[.]" Obviously a judicial declaration of the Board's powers under the constitution would have political repercussions—"all constitutional interpretations have political consequences." R. Jackson, *The Supreme Court in the American System* 56 (1955). *Still, a court "cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority[,]" Baker v. Carr,* 396 [369] U.S. at 217 [82 S.Ct. 691], *unless the matter at hand has been committed to another branch of government and a decision would compel the court "to make judgments not susceptible to the usual tools of judicial methodology[.]"* K. Ripple, *Constitutional Litigation* 96 (1984). Inasmuch as the matter at hand was *textual interpretation, which undoubtedly constitutes judicial fare,* the circuit court erred in

dismissing the plaintiffs' suit on the ground that it involved political questions.

70 Haw. at 262–63, 768 P.2d at 1285 (emphasis added).

Similarly, in *Kaho'ohanohano*, this court also concluded that the interpretation of the parties' rights and obligations under the Hawai'i State Constitution was justiciable and did not pose a political question. 114 Hawai'i at 310, 162 P.3d at 704. In that case, the trustees of the State Employees' Retirement System ("ERS") intervened in a lawsuit seeking declaratory and injunctive relief, specifically a declaration that Act 100 of the 1999 legislative session (which diverted $346.9 million from the employees' retirement system) violated Article XVI, Section 2 of the Hawai'i State Constitution, which prohibits the impairment or diminishment of accrued benefits of ERS members. 114 Hawai'i at 315, 162 P.3d at 709. In *Kaho'ohanohano*, as in the appeal at bar, the State defendants argued that the case was more like *Yamasaki* and *OHA*, because the manner of funding the ERS was a matter within the authority of the legislative branch, *see* 114 Hawai'i at 334, 162 P.3d at 728, while the trustees argued that the case was more like *Waihee*, because it called upon the court to interpret the constitution, a "task most appropriate to judicial action." *Id.*

██ In *Kaho'ohanohano*, this court concluded that interpreting the Hawai'i constitution and deciding whether the Act 100 violated the Hawai'i Constitution was "textual interpretation, which undoubtedly constitutes judicial fare," 114 Hawai'i at 335, 162 P.3d at 729, and ultimately remanded the case (after an analysis concluding that the Hawai'i constitution had been violated) for entry of summary judgment against the State and in favor of the ERS trustees. 114 Hawai'i at 355, 162 P.3d at 749. In short, both *Waihee* and *Kaho'ohanohano* stand for the proposition that textual interpretation, particularly constitutional interpretation, is generally judicial fare. *See also State v. Nakata*, 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994) ("American legislatures must adhere to the provisions of a written constitution.... Our ultimate authority is the Constitution; and the courts, not the legislature, are the ultimate interpreters of the Constitution.") (citations omitted).

██ Reconciling *Yamasaki/OHA* and *Waihee/Kaho'ohanohano*, it can be said that a court is to interpret constitutional questions as long as there do not exist uncertainties surrounding the subject matter that have been clearly committed to another branch of government to resolve.

The constitutional question presented is whether the legislature has followed the constitutional mandate contained in Article XII, Section 1, to make "sufficient sums" available to DHHL for the purposes of (1) development of home, agriculture, farm and ranch lots; (2) home, agriculture, aquaculture, farm and ranch loans; (3) rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved; and (4) the administration and operating budget of the DHHL. *See Schwab v. Ariyoshi*, 58 Haw. 25, 37, 564 P.2d 135, 143 (1977) ("As a general rule, the role of the court in supervising the activity of the legislature is confined to seeing that the actions of the legislature do not violate any constitutional provision."). We must, however, explore whether there exist uncertainties surrounding the constitutional mandate that would render the determination of "sufficient sums" as to these four purposes a nonjusticiable political question.

B. **The 1978 Constitutional Convention History Provides Judicially Discoverable and Manageable Standards and Makes Initial Policy Determinations as to What Constitutes "Sufficient Sums" for DHHL's Administrative and Operating Expenses.**

██ At issue is the interpretation of the phrase "sufficient sums" in Article XII, Section 1. "The general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written[.]" *Spears v. Honda*, 51 Haw. 1, 6, 449 P.2d 130, 134 (1968) (citation omitted). The words in a constitu-

tional provision are also "presumed to be used in their natural sense." *Employees' Retirement Sys. v. Ho*, 44 Haw. 154, 159, 352 P.2d 861, 864 (1960). In its natural sense, the word "sufficient" means "marked by quantity, scope, power, or quality to meet with the demands, wants, or needs of a situation or of a proposed use or end," and the word "sum" means "an indefinite or specified amount of money." *Webster's Third New International Dictionary* 2284, 2289 (1967).

■ Even with these popular definitions in mind, it is unclear what precisely the constitutional delegates intended when they used the term "sufficient sums." In such a situation, we may look to "the history of the times and the state of being when the constitutional provision was adopted." *State v. Kahlbaun*, 64 Haw. 197, 202, 638 P.2d 309, 315 (1981) (citations omitted). In doing so, "the object sought to be accomplished and the evils sought to be remedied should be kept in mind by the courts." *Hawaii Gov't Employees' Ass'n v. County of Maui*, 59 Haw. 65, 81, 576 P.2d 1029, 1039 (1978) (citation omitted).

■ "In order to give effect to the intention of the framers and the people adopting a constitutional provision, an examination of the debates, proceedings and committee reports is useful." *Kahlbaun*, 64 Haw. at 204, 638 P.2d at 316 (citations omitted). We first start with the Committee on Hawaiian Affairs, which crafted the amendment. The Committee stated the following: "Your committee proposal makes it expressly clear that the legislature is to fund DHHL for purposes which reflect the spirit and intent of the Act. *Your Committee decided to no longer allow the legislature discretion in this area.*" Stand. Comm. Rep. No. 56, in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978 ("2 Proceedings"), at 630 (1980) (emphasis added). As to the mandatory nature of the word "shall," Delegate Hagino explained to the Committee of the Whole:

I would like to focus on the word "shall" in the phrase "shall make sufficient sums available" in lines 3 and 4, page 2 of Committee Proposal No. 11; "shall" mandates the legislature to fund the Department of Hawaiian Home Lands for purposes which reflect the spirit and intent of the Hawai-

ian Homes Commission Act of 1920. . . . The rehabilitation concept could not work because the act was never intended to work. Most of the available lands were poor faming quality and only 2 percent of the land could be properly developed at a reasonable cost.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 ("1 Proceedings"), at 412–13 (1980).

The committee elaborated that it intended for the legislature to fund DHHL for the following purposes, consistent with the Hawaiian Homes Commission Act:

1. For the development of site improvements for home, agriculture, farm and ranch lots. Development shall include but not be limited to off-site and on-site improvements which are necessary to provide grading, access (roads) and utility services (drainage, sewerage, water and electrical systems) for the developed lots;

2. For lessee loans in the areas of home construction and farm and ranch construction and equipment. Under this loan mandate, DHHL is authorized to request loans for lessees or native Hawaiians for agricultural purposes, which includes but is not limited to aquaculture;

3. For various rehabilitation projects, including education, social, political, economic and cultural processes which contribute to the general welfare and betterment of native Hawaiian conditions; and

4. For administrative and operational costs, which expenditure requests are to be utilized for all of the above-mentioned.

Stand. Comm. Rep. No. 56, in 2 Proceedings, at 630.

The committee·found that mandating legislative funding of DHHL for these purposes was necessary because DHHL "was established by the Act to provide means to rehabilitate its beneficiaries through a series of projects and yet *was given very little financial assistance to perfect its mandate.*" *Id.* at 631 (emphasis added). Delegate De Soto explained that the committee had held public hearings statewide, where it became appar-

ent that "the identifiable problem areas were—first, that the DHHL—the Department of Hawaiian Home Lands—which provides a land base, has a *monumental and eternal dilemma in funding[.]* " Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 410 (emphasis added).

The committee considered it especially problematic that DHHL was the only one of 17 executive departments [6] forced to finance itself by leasing its own land "in order to generate revenues to support its administrative and operating budget." Stand. Comm. Rep. No. 56, 2 Proceedings, at 631; Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, 1 Proceedings, at 415. Delegate Ontai elaborated:

> [T]he Hawaiian homes department and the act were and are the most neglected part of the State of Hawaii, the most neglected department. It was woefully lacking in funds at its inception, and for the past 50 years and even today, it lacks funds to run the department properly, lacks funds to construct homes and facilities necessary to service existing and future applicants.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 422.

The Committee noted that overreliance on leasing occurred at the expense of the department's mission to rehabilitate native Hawaiians:

> DHHL cannot afford to lease more acreage to the general public for the purpose of generating income to accommodate a minimal employee level.

It is clear to your Committee that the intent and spirit of the Act would be better moneys served [sic] by releasing the department of its present burden to generate revenues through the general leasing of its lands. Your Committee decided that through legislative funding this dilemma would be resolved. In that manner more lands could be made available to the intended beneficiaries.

Stand. Comm. Rep. No. 56, 2 Proceedings, at 632.

The severity of the leasing problem was highlighted by Delegate De Soto, in light of the fact that leased lands became unavailable for homestead lots:

> Today over 113,000 acres of [a total of 203,500] DHHL lands are leased to the public through leases, revocable permits or licenses. Another 16,000 acres are under governor executive orders, this all coming prior to 1972. Another 22,000 acres are utilized by federal, state and county agencies without document, and another 40,000 acres are classified as conservation. In all, 85 percent of DHHL lands (170,000 acres) are utilized by the general public; 12–1/2 percent have actually been utilized by the intended beneficiaries, or 400 acres per annum have been transferred to native Hawaiians since 1920. At that rate, it would take over 400 years to fully dispose of the lands, provided the department could regain those lands utilized by the government and public sector. Mr. Chairman, this is 1978, 130 years after the Great Mahele, and the *maka'ainana* are still a landless, drifting nonentity. Through no

6. 1978 Constitutional Convention Delegate Helene Hale pointed out in her opposition to the amendment that the 1950 Constitutional Convention had rejected proposed language to fund the Department of Hawaiian Home Lands on equal footing with the other executive departments:

> What the Legislative Reference Bureau book on Article XI fails to tell us is what really happened in 1950. The committee had recommended that an additional sentence be put in the Constitution, namely: "Such appropriations for administration expenses of the Hawaiian Homes Commission shall never be less than, after due consideration of the receipts applicable to such expenses from the Hawaiian home lands, will accord said Commission

> equal treatment with other departments of the state in the funds available for its administration expenses."
>
> What I'm trying to tell you is that the 1950 convention had this in their report. This provision was deleted in the Committee on the Whole with the concurrence of the chairman of the committee after many hours of debate because the majority of the convention felt that the language was too strong.

Debates in Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, 1 Proceedings, at 416. Ironically, inaction at the 1950 Constitutional Convention may have created the funding problem that the 1978 Constitutional Convention was compelled to address.

fault of their own, they have been foreclosed from the breath of life—the 'aina.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 411. Delegate Crozier remarked that "only 2,000 acres [are left] for more general leases or for Hawaiians to use . . . [T]he department, in terms of general leases, has reached a point of diminishing returns. The reality of this is that the department cannot lease out any more land." *Id.* at 415.

In short, in 1978, it was apparent that DHHL was swept up in a vicious cycle: in order to fulfill its mission of providing homestead lots to beneficiaries, the department had to raise revenue to sustain its programmatic and human infrastructure costs (administrative and operating expenses), and in order to raise money for administrative and operating expenses, the department had to lease the vast majority of its lands that otherwise would have been used for homestead lots. One commentator viewed the problem as "creat[ing] a conflict of interest: the Commissioners and other Department officials must choose between making land available to homesteading beneficiaries or leasing the lands to non-Hawaiians, thus assuring that at least their own salaries will be paid." Lesley Karen Friedman, *Native Hawaiians, Self-Determination, and the Inadequacy of the State Land Trusts*, 14 U. Haw. L.Rev. 519, 544–45 (1992). The primary problem the 1978 delegates focused on was the impending crisis that would result when DHHL ran out of land to general lease to raise revenue for administrative and operating expenses.

The Hawaiian Affairs Committee explained in greater detail how the administrative and operating expenses at that time were raised and used:

> [DHHL's] revenue from general leases, licenses and revenue permits[7] is approximately $1.1 million. . . . The department presently general leases its lands to obtain moneys for administrative expenses and salaries. In order to keep up with a built-

in inflation rate and to rehire prospective employees through [State Comprehensive Employment and Training] ["]SCET["] losses, DHHL continues to general lease more of its lands.

Stand. Comm. Rep. No. 56, 2 Proceedings, at 631–32. An even more detailed explanation as to how administrative and operating costs were allocated follows:

> There are presently only 90 people statewide, who are limited by time and other constraints as to what they can do. As demands on the department and staff grow, a much bigger staff will be required. At present, the DHHL budget calls for the expenditure of $1.3 million; $1.1 million is through land revenues and the rest through Time Certificates of Deposit (TCDs). From this budget, $750,000 goes toward staff salaries for 66 percent of the staff. Even this figure will rise as this portion of the staff is civil service and subject to an 8–percent annual inflation rate.

> The other 34 percent of the staff is funded through the Comprehensive Employment and Training Act (CETA) and the State Comprehensive Employment and Training Program (SCET) funds. If these temporary dollars are cut, the staff would have to be cut accordingly. Not only is there a demand on the money for staff, but there are also other administrative demands that need to be met through funds, especially in the area of record-keeping. Problems the department is facing in record-keeping include a lack of proper equipment to record information, lack of a filing system, the need to automate many portions of the system to speed up the processing of records—now there are only electric typewriters.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 414.

7. The revenue from "licenses and revenue permits" the Committee referred to was provided for in the original HHCA, which directed that 30 percent of the state receipts derived from revenues originating from cultivated canelands and water licenses be transferred to the department to provide a means of developing farm, ranch and home lots." Stand. Comm. Rep. No. 56, 2 Proceedings, at 632; *see also* Hawai'i Constitution, Article XII, § 1.

The constitutional convention delegates focused on providing sufficient sums to DHHL for its administrative and operating expenses in particular, to free up homestead lands for DHHL beneficiaries. Once homestead lands ceased serving as the source of administrative and operating expenses, however, the constitutional convention delegates could not agree as to what would constitute "sufficient sums" for the other three purposes listed under Article XII, Section 1, although a number of delegates weighed in. Delegate Sutton echoed the Committee's four stated purposes and referred to the DHHL's 1976 General Plan:

> I'd like to focus on the word "sufficient" on page 2, line 3 of Committee Proposal No. 11.
>
> . . . .
>
> Again, to the word "sufficient"—what does this really mean? It means funding to develop house lots for applicants on the waiting list or implied in the general plan. It also means money to provide loans to lessees to construct their homes, since the lessee cannot mortgage or encumber the land.
>
> For the administration, there is need for support of a staff to adequately service the department's beneficiaries and to purchase equipment which will allow sufficient management of its resources and records.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 413, 414. Delegate Crozier, like Delegate Sutton, referred to the 1976 DHHL General Plan as setting standards for determining DHHL funding. He stated, "The proposal states: 'The legislature shall make sufficient sums available . . . .' The standards which define 'sufficient' are contained in the department's general plan, approved by the Hawaiian homes commission on October 31, 1975 and signed by Governor Ariyoshi on April 14, 1976." *Id.* at 415.

The 1976 DHHL General Plan that the delegates referred to sets forth the following goals and objectives for the period 1975–1985:

1. *Goal:* Maximize HOUSING assistance for native Hawaiians. *Objective:* Program housing for 2,600 new families.

2. *Goal:* Allocate AGRICULTURAL LANDS to native Hawaiians. Objective: Allocate at least 40,000 additional acres for direct agricultural use by eligible Hawaiians; use all available techniques to maximize productivity of agricultural lands (Note: The Hawaiian Homes Commission Act sets 20,000 acres as the limit which can be allocated within any five-year period.)

3. *Goal:* Reduce the acreage of LANDS USED FOR INCOME purposes.

*Objective:* Reduce by at least 20,000 acres the lands presently under general lease and temporary use permit and make these lands available for direct use by native Hawaiians.

4. *Goal:* Maximize INCOME through more effective land management.

*Objective:* Use only a small fraction of Hawaiian Home Lands to generate income for operating and administrative expenses.

*Hawaiian Home Lands General Plan* ii (1976).

As to how DHHL would utilize "sufficient sums" made available to it, Delegate Sutton explained:

> By 1984, 6,000 homes will be needed to meet the requirements of the DHHL general plan, which is now in existence—the one started in 1974. The department must conform to county standards for site development in order to qualify for dedication of roads, etc. to the county for maintenance purposes. The department must conform to housing construction ordinances in order to qualify for federal monies under Farmers Home Administration (FmHA).
>
> The State must not only insure there are funds to prepare sites but also insure that there is a way for the DHHL administration to be fully funded to get the ever-mounting paperwork done.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 414.

A number of delegates spoke against the proposed amendment. One of their concerns was the uncertainty surrounding what sum would constitute a "sufficient sum" to fulfill all of the four proposed constitutional pur-

poses: (1) for developing home, agriculture, farm, and ranch lots; (2) for home, agriculture, aquaculture, farm and ranch loans; (3) for rehabilitation projects; and (4) for administrative and operational costs. Delegate William Burgess repeatedly attempted to pin down a numerical figure as follows:

No matter how just the cause or how strong the feeling and how meritorious or how beautiful the poetry, I believe that we are here as constitution-makers and not as legislators. This proposal is specific legislation and specifically requires the appropriation of moneys. We have not apparently investigated the cost—I have heard figures of $200 and $300 million to carry out the programs that are appropriated in this proposal—I refer specifically to page 2. I believe that we are venturing into an area beyond what we are supposed to do as delegates to this Convention. I therefore speak against it.

Second Reading, Committee of the Whole Report No. 11, Comm. Prop. No. 11, 2 Proceedings, at 272. Delegate DiBianco's expressed his doubt as follows: "I don't know how much money is involved here, and it troubles me. I don't know whether this Convention realizes the extent to which it is mandating the State to guarantee funds." *Id.*

Although the DHHL's 1976 General Plan referenced the sum of $250,000,000 to carry out its goals, *see Hawaiian Home Lands General Plan* 93, when the delegates finally settled on a numerical figure for "sufficient sums," the General Plan did not frame their discussion. Delegates Burgess, Delegate De Soto and Sutton, through the following dialogue, ultimately arrived at $1.3 to 1.6 million as a "sufficient sum," and that figure related only to administrative and operating expenses:

Delegate Burgess: [W]hat would be the estimated cost of these programs which are mandated?

. . . .

Delegate De Soto: What we propose with respect to "shall fund" is the administrative and costs of running the Hawaiian homes program, which would amount to operating and administrating approximate-

ly $1.3 to $1.6 million, taking into consideration inflation, collective bargaining agreements that go into inflation with the pay.

. . . .

Delegate Burgess: I would ask—is the $1.3 to $1.6 million that was mentioned the total cost of the programs which are mandated to the legislature? Does that amount include the development of home, agriculture, farm and ranch lots, and the other aims that are cited on page 2 of the proposal?

. . . .

Delegate Burgess: Does the $1.3 to $1.6 million figure that was mentioned just a few minutes ago include the costs of the home developments, the loans and the other rehabilitation projects which are referred to on page 2?—in other words, the development of home, agriculture, farm and ranch lots; the home, agriculture, aquaculture, ranch and farms loans; and all of those programs. Are all of those included in the total estimate of the $1.3 million to fund this program, or is the total cost to the State different from that?

. . . .

Delegate Sutton: The $1.3 to $1.6 million is for administrative costs at present. Their need is more. The way the State itself can fund all the rest of the projects— and directly answering your question, delegate, is no, is not only $1.3 to $1.6 million—the way the State can find the funds is through mutual agreement with different parts of the government here in Hawaii; and that is, for the poor people who qualify, that is for HHA or Hawaiian Homes Commission Act properties, that there are similar needs and requirements for those to get the land—that is, under $10,000 net assets. The State may fund these projects and come out with considerably more for the people at less of an expense, simply because the Hawaiian homes commission has land and does not need to condemn and purchase other land to fit the needy at that level.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 421–22.

■ Thus, by the end of the Committee on the Whole Debates, what was certain was that the $1.3 to $1.6 figure represented "suf-

ficient sums" for administrative and operating expenses only. As to that purpose under Article XII, then, the 1978 Constitutional Convention history does provide judicially discoverable and manageable standards that do not involve initial policy determinations of a kind clearly for nonjudicial discretion. At a minimum, funding at or above the $1.3 to $1.6 million envisioned in 1978 would be required.[8] Therefore, the determination of what constitutes "sufficient sums" for administrative and operating expenses is not barred by the political question doctrine.

As such, we disagree with the State's argument that "[a] court cannot determine how much money is needed to administer and operate DHHL, after all, until it determines how many lots, loans, and rehabilitation projects (and their scope) DHHL must provide." The consideration of such factors could provide the basis for increasing the required administrative funding above the 1978 baseline identified by the delegates, but could also involve the courts in addressing issues (the development of lots, loans, and rehabilitation projects) that involve political questions. *See* Part IV.C *infra*. However, we reject the State's suggestion that challenges associated with determining the upper limit of the required administrative funding render the calculation of the minimum required contribution nonjusticiable. It is clear that the constitutional delegates intended to require appropriation of "sufficient sums" to relieve DHHL of the burden of general leasing its lands to generate administrative and operating funds, and to that end, they identified the minimum funding necessary for such expenses.[9]

### C. What Constitutes "Sufficient Sums" as to the Other Three Enumerated Purposes under Article XII, Section 1 Remains a Political Question.

The 1978 Constitutional Convention history of Article XII, Section 1 can be broadly understood as committing the legislature to funding DHHL's administrative and operating expenses, because DHHL was the only executive agency within the State forced into leasing its own lands to administer its own programs. Further, placing DHHL on the horns of the funding dilemma occurred at the expense of its own beneficiaries, as the leased lands became unavailable for homesteads. Alleviating the DHHL of the burden of general leasing its own lands was an important first step towards assisting the department in fulfilling its mission. Unfortunately, the 1978 Constitutional Convention history is less clear on what "sufficient sums" for the next steps would be, once the lands were freed.

The 1978 Constitutional Convention history is not nearly as detailed in explaining what sufficient sums would be for (1) developing home, agriculture, farm, and ranch lots; (2)(2) lessee loans for home, agriculture, aquaculture, farm and ranch loans; and (3) for rehabilitation projects.

### 1. Purpose Number One: The Development of Home, Agriculture, Farm and Ranch Lots

As to the first purpose, the "development of home, agriculture, farm and ranch lots," the delegates made only passing references to the "sufficient sums" needed: "The $1.3 to $1.6 million is for administrative costs at present. *[DHHL's] need is more.* The way the State itself can fund all the rest of the projects ... is through mutual agreement with different parts of the government here in Hawaii." Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 422 (emphasis added). Although "more" than $1.3 to 1.6 million is mentioned, no further details were

---

8. Presumably, this figure could be adjusted to reflect the impact of factors such as inflation or increased collective bargaining costs, both of which were acknowledged by Delegate De Soto as factors that could appropriately be taken into account in determining the required contribution. *See* Debates in the Committee on the Whole on Hawaiian Affairs Comm. Prop. No. 11, in 1 Proceedings, at 421.

9. We note that in supplemental briefing, the DHHL Defendants newly concede that the political question does *not* bar adjudication of what would constitute "sufficient sums" made available to DHHL *for administrative and operating expenses.*

provided as to how much more, and Delegate Sutton elaborated only on his idea of mutual assistance as follows:

> One way the DHHL can save the State funds, and thus insure that there will be enough funds to meet their [site development] needs, is through mutual assistance with other agencies, such as the Hawaii Housing Authority (HHA). Qualifications for DHHL and HHA are very similar in that they both require that the applicant net not over $10,000. DHHL could provide land to those who qualify under both DHHL and HHA programs. The total cost for land acquisition to the State in order to develop homes for the needy under DHHL authority is zero—nothing— contrasted with the State having to purchase land for the same people qualifying for housing. As it is now, the Hawaii Housing Authority has to condemn the land, pushing the average cost of a home over $60,000. The poor cannot afford these high-priced homes (myself included). They could afford homes much more easily under mutual assistance programs.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, 1 Proceedings, at 414; *see also id.* at 422. Sutton's comments spoke only to "saving" the State money, not how much money the State should provide to DHHL as "sufficient sums" for the development of home, agriculture, farm, and ranch lots.

### 2. Purpose Number Two: Home, Agriculture, Aquaculture, Farm and Ranch Loans

The delegates also did not discuss what "sufficient sums" would be as to the second purpose: "home, agriculture, aquaculture, farm and ranch loans." Instead, the only discussion of DHHL loans in the 1978 Constitutional Convention history was in connection with Committee Proposal No. 14, which amended then-Article VI, to include a debt limitation on the issuance of general obligation bonds. Comm. Prop. No. 14, 1 Proceedings, at 814–25. That amendment set a ceiling on how much DHHL loans would contribute towards the State's debt limit. *Id.* at 822; *see also* 2 Proceedings, at 345–47; Debates in the Committee of the Whole on

Committee Proposal No. 14, 1 Proceedings, at 468, 470–72. The delegates did not mention how much in DHHL loans the legislature should provide in the first instance, under the "sufficient sums" mandate.

### 3. Purpose Number Three: Rehabilitation Projects

As to the third purpose, "rehabilitation projects to include, but not limited to, educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved," the delegates proposed that funding for this purpose come from the "Native Hawaiian Rehabilitation Fund," and amended Section 213 of the Hawaiian Homes Commission Act to establish this fund. Comm. Prop. No. 11, 2 Proceedings, at 808; Stand. Comm. Rep. No. 56, 2 Proceedings, at 635. The fund would consist of "thirty percent of the state receipts derived from lands previously cultivated as sugarcane lands ... and from water licenses[.]" *Id.* DHHL was mandated to use this fund "solely for the rehabilitation of native Hawaiians which shall include but not be limited to the educational, economic, political, social and cultural processes by which the general welfare and conditions of native Hawaiians are thereby improved and perpetuated." *Id.* This amendment closely tracked the language of Article XII, Section 1.

The delegates did not extensively discuss this new provision beyond Delegate Les Ihara's observation:

> This fund will allow the Hawaiian homes commission to more economically utilize Hawaiian homestead lands and to promote a nonpartisan political education ... This fund is not designed to relieve the State of its responsibilities to the people of Hawaii outside the Hawaiian homes commission. This fund is but one step toward maintaining and promoting the cultural heritage of our native Hawaiian people.

Debates in the Committee of the Whole on Hawaiian Affairs Comm. Prop. No. 11, 1 Proceedings, at 422. No further discussion elucidated whether the delegates intended the legislature to provide more funding be-

yond the Native Hawaiian Rehabilitation Fund, and if so, how much funding would constitute "sufficient sums" for that purpose.

In conclusion, the constitutional convention delegates made only passing references to the three remaining purposes under Article XII, Section 1. There was no discussion at all as to what would constitute "sufficient sums" as to any of the remaining three purposes. Therefore, the text of Article XII, Section 1, and its accompanying constitutional convention history, shed no light on how many home, agriculture, farm and ranch lots must be developed in a certain period of time, so that what would constitute "sufficient sums" to that end is not clear. Moreover, what would constitute "sufficient sums" for home, agriculture, aquaculture, farm and ranch loans, as well as rehabilitation projects, is also unclear.

In *Yamasaki*, we held that the interpretation of the language of HRS § 10–13.5, directing "[t]wenty per cent of all *funds* derived from *the public land trust* " to be expended by OHA, was nonjudicial fare, because the legislature had yet to define "funds," and had acknowledged that the boundaries of the "public land trust" were undetermined. 69 Haw. at 172–73, 737 P.2d at 457–58 (emphasis added). Similarly, in the instant appeal, the language and constitutional convention history of Article XII, Section 1, contain undetermined goals for home, agriculture, farm, and ranch lots; home, agriculture, aquaculture, farm and ranch loans; and rehabilitation projects, barring judicial interpretation of "sufficient sums" as to those purposes. In short, Article XII, Section 1 and its accompanying constitutional convention history provide no "judicially discoverable and manageable standards" for determining "sufficient sums" for these three purposes without "initial policy determination[s] of a kind clearly for nonjudicial discretion." 69 Haw. at 173, 737 P.2d at 457 (citing *Baker*, 369 U.S. at 217, 82 S.Ct. 691). The determination of "sufficient sums" for these three purposes, therefore, poses a nonjusticiable political question.

We agree with the Plaintiffs that, "the State has failed, by any reasonable measure, under the undisputed facts, to provide suffi-cient funding to DHHL[.]" The State's track record in supporting DHHL's success is poor, as evidenced by the tens of thousands of qualified applicants on the waiting lists and the decades-long wait for homestead lots. *See generally, A Broken Trust: The Hawaiian Homelands Program: Seventy Years of Failure of the Federal and State Governments to Protect the Civil Rights of Native Hawaiians* (1991). With the benefit of 35–90 years of hindsight, it is clear that DHHL is underfunded and has not been able to fulfill all of its constitutional purposes. However, were we to remand this case to the circuit court to grant declaratory relief to Plaintiffs as to all of the constitutional purposes encompassed in Count 1, the circuit court still would not be able to mandate the *affirmative* injunctive relief that the Plaintiffs seek without encountering the same uncertainty with regard to what constitutes "sufficient sums" as to the remaining three purposes under Article XII, Section 1, explained *supra.* The Plaintiffs prayed for an injunction requiring the State to "place as many beneficiaries on the department's waiting lists for residence, farms, and ranches on available Hawaiian home lands within a reasonable period of time." Article XII, Section 1 and its constitutional convention history shed no light on what those "sufficient sums" might be.

Declaratory relief as to the other three purposes, then, is not available, pursuant to HRS § 632–1 (1993), which provides in relevant part, with emphasis added:

> Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, *and the court is satisfied also that a declaratory judgment will serve to ter-*

*minate the uncertainty or controversy giv- ing rise to the proceeding.*

In this case, were the circuit court to declare that funding to DHHL for the other three purposes has been insufficient, such declaration would not "terminate the uncertainty or controversy giving rise to the proceeding," as judicial determination of what affirmatively constitutes "sufficient sums" for the other three constitutional purposes is nonjusticiable, based on the political question doctrine.

## IV.   Conclusion

We affirm the ICA's judgment, but only on the narrower ground that the determination of what constitutes "sufficient sums" for administrative and operating expenses under the Hawai'i Constitution's Article XII, Section 1 is justiciable and not barred as a political question.   Article XII, Section 1 and its constitutional history, however, do not shed light on what would constitute "sufficient sums" for the other three enumerated purposes;   thus, the political question doctrine bars judicial determination of what would constitute "sufficient sums" for those purposes, and the ICA erred in concluding otherwise.

